[No. 27397. Deparment One. June 1, 1939.]

THE STATE OF WASHINGTON, *Respondent*, v. PAUL BUTTRY, *Appellant*.[1]

[1]Reported in 90 P. (2d) 1026.

230

*W. H. Abel, T. H. McKay, W. J. Murphy,* and *A. Emerson Cross,* for appellant.

*Stanley J. Krause* and *Paul O. Manley,* for respondent.

ROBINSON, J.—On June 8, 1938, the appellant, Paul Buttry, shot and killed Hugh Warren, at Hoquiam, Washington. At the end of a long trial, in which the testimony of more than sixty witnesses was taken, Buttry was convicted of first degree murder, and sentence of death imposed. Some of the twenty-one errors assigned on appeal are of such a nature as to necessitate a comprehensive review of the evidence.

Sometime about nine o'clock on the evening of June 8th, Buttry entered the Chittwood tavern, in Hoquiam, and sat down at the long counter, or bar, which runs lengthwise of the room. His seat was about three or four removed from the entrance door. He remained there for a considerable time, drinking wine in moderation and talking in a natural manner to various acquaintances. About ten, or just before, Hugh Warren came in. As he passed down the aisle between the counter and the wall, he stopped and put his hand on the shoulder of an acquaintance who was sitting immediately at Buttry's left, paused for a few minutes' conversation, then went to the rear of the room, took a seat, and ordered a cup of coffee. There were, perhaps, fifteen people in the tavern, and sub-

stantially all of them knew both men personally or by sight. Neither Buttry nor Warren appeared to pay any attention whatever to the other. About ten minutes after ten, Warren left by the front door.

As Warren went out, Buttry arose and, as several witnesses expressed it, "followed" him. Almost immediately, as some testified, or within a very short time, as others said, or in about a half a minute, as one witness estimated, a burst of gun fire was heard from outside the building. It was so rapid that many thought someone had set off a bunch of firecrackers. As described by at least ten witnesses, the formula was invariably the same, two quick shots, a perceptible pause, but so slight that no one would attempt to measure it by any unit of time, and then a burst of fire so rapid that the individual shots could not be counted.

The sound of firing came from the Myrtle street side of the building. There was a strip of gravel along that side, used for parking purposes; beyond that, the sidewalk, and beyond that, the roadway. All of this space was well lighted by floodlights mounted on a tall pole. A witness, who was standing by one of the windows, testified that he looked out quickly upon hearing the first shots, and saw a man lying on his back on the sidewalk, and another man standing over him shooting him in the face. When his pistol was emptied, the man ran toward the back of the building and climbed into a parked car. By the time the other occupants of the tavern had gotten to the windows or rushed outside, he had disappeared. Within a few minutes, the appellant, Buttry, hurried into the Hoquiam police station and, handing Sergeant Dicken an automatic pistol, said, according to Dicken and another witness: "I have just killed the dirtiest rat that ever lived." At about midnight, Buttry was questioned

at length by the prosecuting attorney, and a transcript of the questions and answers is in the record as an exhibit. We quote from it as to what followed after Buttry followed Warren from the tavern, as follows:

"A. Well, we came out and walked around this way (indicating left) and I told him—we got right here—(indicating) I would like to talk to him. He said, 'O. K.' and we turned and came this way (indicating) and we walked right along, and he turned around on me like this (indicating about-face). He said, 'What the Hell do you mean?' And I said, 'I would like to talk to you.' And he walked on, and he said 'O. K.', and we walked on two or three steps, I guess, and I just can't remember just exactly what he said. He had his hand in his pocket. He turned on me, and he said, 'I don't have to talk to you, you son-of-a-bitch.' He turned on me with his gun. I went for my gun and I shot him. Q. Did you see the gun in his pocket? A. No he had his hand in his pocket, like this (indicating). He was going to shoot me through his pocket. He throwed his gun around on me. He turned around (indicating about-face) like that, and I went for my gun, as soon as I could, and I kept ashooting."

Warren, in fact, had no gun. Buttry, however, pleaded self-defense and stoutly maintained at the trial that, from the position which Warren assumed when he whirled around with his right hand in his coat pocket and with the skirt of his coat thrust out in his direction, he honestly believed that Warren had a gun in that pocket and was about to shoot him without taking the time to draw it.

The evidence showed conclusively that but seven shots were fired, since Buttry's automatic held but eight cartridges, and an unexploded one was found jammed in the barrel of the pistol when he turned it in at the police station. It is beyond dispute that all seven shots struck Warren in the face, one in the right eye, two in the right cheek, three just under, and to

the right of, the point of his chin, and one under the left nostril. The evidence also is that any one of the seven bullets would have been fatal. The coroner's report, which the defense itself offered in evidence, reads, in part, as follows:

"Seven bullet wounds of entrance were found on the face.
"The right hand bore a wound in which one hole was at the root of the thumb and the other at the ulner side of the hand."

The second sentence above quoted is the most important piece of evidence in the case, for it proves conclusively and beyond all possibility of dispute that Warren's right hand was not in his right coat pocket, but in front of his face when at least one of the fatal shots was fired.

There was a great deal of evidence from which the jury could reasonably infer that Warren did not have his right hand in his pocket at all, but was using it to manipulate a lighted cigarette. When the patrons of the tavern rushed to the windows, at least three of them, according to their testimony, saw smoke rising from a lighted cigarette lying on Warren's breast a few inches from his right hand. At least ten witnesses testified to its presence. Witnesses, including police officers who arrived promptly, said Warren's right hand was lying on his chest a few inches from a burning cigarette, and that his left hand was in his coat pocket. The vest which the deceased wore is in the record, and shows a hole burned through it near the left breast pocket.

Nor does the matter of what Warren was doing with his right hand depend upon inference alone. A witness, who was approaching the entrance of the tavern, saw the shooting, which occurred almost directly under a floodlight, and testified that, at the time the shots

were fired, Warren was holding a lighted cigarette in his right hand, and that he was holding that hand in front of his face as "if warding off a blow." He further testified that the pistol was held from two to two and one-half feet from Warren's face. Describing the shots, he said: "The first two were spaced far enough apart to count. After that, it was too rapid to count."

A number of witnesses, including the defendant himself, testified that Warren was right-handed. Eight or ten witnesses said that he had a habit of keeping his hands in his coat pockets when standing around, particularly his left hand.

The prosecution introduced evidence of threats by Buttry against the life of Warren, made to ten different people during the six months preceding the shooting, three of them being accompanied by the display of a pistol. It was testified that, on some of these occasions, Buttry said he would kill the son of a bitch; on others, that he would shoot him and leave him lie like a rat. On account of the fact that a new trial is claimed on the ground that the prosecutor's closing argument was prejudicially violent, it is, unfortunately, necessary to quote some of these threats.

A fellow workman of Buttry testified that Buttry said to him: "If Hugh Warren did not quit talking, if he did not quit telling that I broke up his home, I will kill the son of a bitch." Charles Toler, the father of Catherine Warren, ex-wife of Hugh Warren, testified that Buttry said, in a conversation with him: "Some day I am going out gunning and when I come back there will be no Hugh Warren." Robert Davies, husband of another of Toler's daughters, testified that Buttry, speaking of Hugh Warren, said: "I will kill the son of a bitch," and Mrs. Davies, Catherine Warren's sister, testified that Buttry said, speaking of Hugh

Warren, and in the presence of her sister Catherine, his ex-wife: "I will kill the son of a bitch. I will kill him and cut his heart out and fry it until it sizzles."

Buttry denied making some of the threats testified to by witnesses for the state and toned down the language of others. What remained after his explanations and denials the defense sought to counteract by requesting the following instruction, the refusal of which forms the basis of one of the assignments of error:

"If you believe from the evidence, or entertain a reasonable doubt, that defendant made any threat or threats, not with intent to carry any such threat or threats into execution, but merely to the end of warning Hugh Warren and to cause him to desist from circulating statements concerning the defendant or Catherine Warren, then I instruct you you should not consider such threats in determining whether or not defendant had a premeditated design to effect the death of Hugh Warren."

We may indicate in passing that we think this assignment is obviously without merit.

Appellant Buttry and Hugh Warren grew up together on neighboring farms in Arkansas and attended the same country school. In 1923, then being in the early twenties, they set out for the west in Buttry's roadster. Warren had sisters, brothers, aunts, and uncles in Centralia, South Bend, and Grays Harbor City. Buttry and Warren worked together in the Warren lumber camps. Later, they worked in the wheat fields in eastern Oregon, and at fruit packing in the Yakima valley. From 1924 to 1928, Buttry worked in Oregon, Oklahoma, Texas, and Arkansas, but came back to Aberdeen in 1927. In the meantime, Hugh Warren had married Catherine Toler.

The Warrens provided Buttry with a job in a South Bend logging camp. In April, 1928, he came back to

Grays Harbor and worked for the Warrens in their gasoline service stations. During that summer, Buttry married, but his wife left him in August. From 1929 to 1933, he worked in various parts of the state, making an occasional trip to Aberdeen. He went back to Arkansas in 1935, but returned to Washington in 1937. Hugh Warren and his wife Catherine were then operating a service station, with living quarters annexed. Mrs. Warren kept the books and assisted in other ways. On November 7th, Warren left for Arkansas, and returned the last of that month. In his absence, Buttry assisted Catherine Warren in running the station.

For the story of the development of the triangle situation between Warren and his wife and Buttry, we must rely almost wholly upon the evidence of the survivors, Buttry and Catherine Warren. In 1936, Buttry got a job at the Harbor plywood plant, but between shifts continued to assist the Warrens at the service station. For this he received, at first, his board only. Later, the Warrens left their quarters at the service station and rented a nearby house. Buttry testified that, at Warren's insistence, he occupied a room there. When he worked on the so-called graveyard shift, he would get home early in the morning, cut some wood, enter the house through the kitchen door, which was left unlocked for that purpose, and start the fires. Then he would open up the service station and take care of it until Warren appeared. Sometime during the forenoon, he would take his daily sleep. At eleven o'clock, Catherine Warren prepared his lunch, and sometimes drove him to his work.

On one occasion, when working on the day shift, he took Catherine Warren to a midnight matinee; on another, he took her to a keno party. In each case, so Buttry and Mrs. Warren testified, he did so at the insistence of Warren. Warren asked Buttry to take his

wife to another keno party. Unknown to all of them, the party had been postponed. On learning this when they arrived at the place where it was to have been held, Buttry and Mrs. Warren went for a drive. They testified that they were gone for less than an hour. When Buttry came home from work the next morning, he found the kitchen door locked. According to Mrs. Warren, her husband, at breakfast time, accused her of misconduct with Buttry. According to Buttry, Warren went to the service station and made a similar charge. According to both witnesses, Buttry and Warren later came over to the house, and there, after threshing out the whole matter, Warren begged their forgiveness; but Buttry at once moved to a hotel.

Warren, however, kept nagging his wife. Unable to endure it, she threatened to take a dose of poison. Warren sent for Buttry, and Buttry persuaded her to continue living for the sake of her children. Later, he was invited over to assist in celebrating Mrs. Warren's birthday. Warren, however, kept nagging, and Mrs. Warren could no longer live with him. In May, 1937, the husband and wife and Buttry drove to Grays Harbor City to discuss the situation. Buttry wanted to leave the country, but Warren persuaded him to stay, saying, according to Mrs. Warren: "If she leaves me, I know she is going, I want you to have her and you would make a good home for her." It was finally agreed that the Warrens would be divorced, and Buttry would get a divorce and marry Mrs. Warren. Mrs. Warren wanted to move out of the house, as she did not want the service station on her hands. Her husband helped her to move on June 3, 1937, and on July 17th brought suit for divorce. Mrs. Warren testified, in part, as follows:

"In the conversation at Grays Harbor City, my husband told Paul Buttry that he was to marry me. Paul

said, 'What will you do if I don't?' Hugh said, 'I will shoot you.' "

Mrs. Warren lived at the Pacific street house for a few months, and then on Maple street until 1938. She then moved to 103 Eklund street west. Buttry commenced taking his meals with Mrs. Warren when she lived on Maple street. She bought a car, and they used it in common. Warren's final decree was entered on February 27, 1938. On March 5th, Buttry moved into the Eklund street house, although he slept in a sort of a detached attic.

During the period of separation, according to Mrs. Warren, her husband made no attempt at reconciliation. There is strong evidence to the effect that Warren not only called on his wife during that period, but that these calls infuriated Buttry, and there is evidence that Warren sent mutual friends to his wife in an attempt to effect a reconciliation. On such an occasion, according to the intermediary, Buttry was present at Mrs. Warren's house and complained that Warren was doing a lot of talking without any grounds for it, and that he was "going to shoot the God damn son of a bitch if he did not keep his mouth shut."

Buttry and Mrs. Warren planned to get married on June 5th. There was a delay in securing the Buttry divorce. According to Buttry, Warren had prowled around his room when he was living at a hotel and now began to follow him in his car as he drove to his work at midnight. On one occasion when Buttry was standing on the sidewalk, Warren made a feint of running him down. On another, he was sitting in a car with Frank Jenks when Warren drove up the street on the opposite side, opened the side door of his car as he passed, exhibited a gun, and shouted something about getting him. This incident was corroborated with great particularity by Frank Jenks, who added that he

afterwards said to Warren: "You sure like to scared me to death," and that Warren replied: "It is a damn good thing you were there because I meant to get him right then."

Mr. Jenks played a prominent part in the defense of this case. He testified at the trial that he was right at the entrance of the tavern when the shooting broke out and heard the firing, but did not see Buttry shoot Warren, although the shooting occurred under a floodlight only twenty or twenty-five feet from him, and there was nothing to obstruct his view. It appears that, some days after the shooting, he took Mr. A. Emerson Cross to Montesano "to see if I could interest him in the Paul Buttry case." He testified that, when Buttry told his story to Cross in the jail at Montesano a week or ten days after the shooting, he (Jenks) exclaimed: " 'But Hugh did not have a gun, Paul'; whereupon Buttry turned white and grabbed hold of the bars and seemed greatly shocked." He also testified, as above noted, that he saw Warren threaten Buttry with a gun. Yet, two days after the shooting, he told the prosecutor in an interview, portions of which were read to the jury on rebuttal: "I never knew Hugh Warren to carry a gun."

We may say in passing that the incident at the jail gives rise to an assignment of error which is very vigorously pressed. Mr. Cross stated to the court that he wished to testify to Buttry's conduct and appearance when he learned for the first time from Jenks' exclamation, a week or ten days after he had shot Warren, that Warren had no gun, and demanded that the trial judge tell him in advance whether or not he would permit him to argue the case if he testified. The trial judge refused to make an advance ruling. He then demanded that the court require the prosecutor to declare whether or not he would object to his arguing the

case if he testified. The court ruled that he had no right to require the prosecutor to say whether or not he would object. Mr. Cross then elected not to testify.

It is vigorously argued that the accused was thus deprived of his constitutional rights. We see no merit in this assignment. In the first place, the ruling of the court was technically correct. Besides, it is very doubtful whether the testimony was admissible, it being in the nature of a self-serving declaration made by conduct long after the event. Also, the offer was made before the jury, and it knew exactly what Mr. Cross was going to say if he were permitted to say it. Further, the evidence was merely cumulative, since Buttry and Jenks had both testified to the same effect. Furthermore, it was in evidence that, when asked by the prosecutor on the night of the shooting whether Warren had actually had a gun on him or not, Buttry had replied: "I don't know; I didn't wait to see."

There was testimony by the husband of Buttry's sister that Warren had told him that Buttry was to marry Mrs. Warren, and, also, that on one occasion he saw some kind of a pistol lying on the floor in front of the back seat of Warren's car. There was testimony, also, by Mrs. Martinson, a restaurant keeper, that Warren asked her one day if she was divorced, and, upon being told that she was, Warren said:

"But anyway he says: 'Well, I hope nobody moved in on you like they did on me.' I said: 'Well, no, nobody moved in on me.' And then I asked him a question and he said yes. I said 'What did you do?' He says: 'I moved her out.' He said 'I rented a house for her and cut off her credit and moved her out.'

"There is some of it yet I can't recall, some of the conversation. Then he quit talking to me and looked straight out the window, a big window in front of us, and he dropped his knife down on his plate, and says: 'I have a good mind, I can pull that to go up there and blast them both out.' "

It is not contended, however, that this threat was communicated to Buttry. It did not come to light until after Mrs. Martinson read about the shooting in the newspaper, whereupon she offered her services to Catherine Warren, by telegram.

Another witness testified that he once encountered Hugh Warren when he was in an intoxicated condition, and that he was going over to see Buttry and "whittle him down to my size." He persuaded him to go home. This witness also testified that Warren always spoke well of Buttry and Catherine Warren, when sober.

Buttry testified that, after it became necessary to postpone his wedding to Mrs. Warren from June 5th to June 20th, he felt sure, from Warren's actions, that Warren thought he was stalling and was not going to marry Mrs. Warren, and that Warren was likely to carry out his threat to shoot him. The older of the Warren children was in the custody of her father after the divorce. On the evening of June 8th, Warren took the child to visit her mother. He drove her right to the house where Buttry and Mrs. Warren were living, although Mrs. Warren had asked him not to come near them, but to let the child out of the car several blocks away. Buttry saw Warren from the window. He thought his coming directly to the house was a kind of defiance. After he had gone, he went to a dresser in Mrs. Warren's bedroom, took out his automatic, pumped a cartridge in the chamber so that it would be ready for instant use, put the gun in his shirt, and started to look for Warren. He wanted to explain to him why the wedding had been postponed, and took the gun along for protection. He did not find Warren at his service station. He then went to the Chittwood tavern, knowing, he said, that Warren would drop in there during the evening. When Warren came into the

tavern, he had his right hand in his right coat pocket, and, when he left, he was still carrying his right hand in his right coat pocket, and Buttry was certain that that hand was holding a gun. He followed him out the door and called to him with the idea of having a talk. They walked around the corner of the building, and the shooting occurred as described earlier in this opinion.

All of the assignments of error have been considered and examined. We can discuss only those which are the more insistently urged.

■ After the trial, it was discovered and proved that one of the jurors was not a taxpayer, that is, unless that term includes one who pays sales taxes. This is alleged as a ground for a new trial. It was held, however, in *State v. Patterson*, 183 Wash. 239, 48 P. (2d) 193, that such a disqualification cannot be urged after verdict.

■ It is also urged that a new trial should be granted upon the ground that certain hearsay testimony of Catherine Warren was admitted, of such character as to cause passion and prejudice. The evidence complained of was brought out in the cross-examination of Catherine Warren and was as follows:

"Q. Well, I will ask you about another threat. I want you to think carefully before you answer. I will ask you if, in February, 1938, you and Paul Buttry were out at your mother's place on the Wishkah Road, and in the presence of you and of your mother, Paul Buttry said, 'I will fill Hugh Warren's face so full of holes that you won't recognize him at the funeral?' A. I have heard my mother say something like that and say I was there, but to say that I remember it, I can't. Q. You didn't hear that one either? A. No. Q. You wouldn't deny it was made? A. No, I wouldn't but I say I don't remember."

At that time, Catherine Warren's mother was under state subpoena, to which she later proved unable to

respond because of a heart attack. No objection was made at the time. A motion to strike was made at the close of the case, in which the prosecutor joined, and the court withdrew this testimony in instruction No. 11, specifically warning the jury not to permit any prejudice to arise in their minds on account of it.

The appellant vigorously complains of instruction No. 30:

"Before a person can take the life of an assailant, he must be in a position where he cannot retreat without increasing danger to his life or subjecting himself to great bodily harm, and if he can retreat without so increasing his danger to life or great bodily harm, he cannot successfully invoke the doctrine of self-defense."

It is contended that this instruction was abstract, incomplete, and, under the facts, misleading and confusing. This might have been true, at least in part, had the instruction stood alone, but it was but introductory to a long series of instructions on self-defense, in which, as we view it, the appellant received more than was his due. It must be remembered that, according to his own evidence, the appellant thought, on the evening of June 8th, that Warren wanted to kill him; that he got his automatic pistol, loaded it, and went out to look for Warren; that he testified that, when Warren came into the tavern, he was certain that he was holding a gun in his right hand pocket, and was equally certain that he was doing so when he walked out of the tavern. Yet, he followed him out and brought about the fatal encounter. This comes very near, if not altogether to the point of, bringing the appellant under the rule discussed in *State v. Lance,* 94 Wash. 484, 162 Pac. 574. It can be very plausibly contended that the appellant was not entitled to rely on self-defense. However that may be, the court gave twelve instructions covering self-defense, ten of which were

requested by the appellant. These ten, at least, were distinctly favorable to him. We quote a portion of No. 38, and all of instructions Nos. 41 and 42, as showing their general character:

"If you find or entertain a reasonable doubt from all the circumstances and evidence introduced upon the trial of this cause, that the defendant at the time that he admitted that he fired the shots that resulted in the death of Hugh Warren, reasonably believed that defendant Hugh Warren was armed with a loaded gun which he concealed in one of his pockets, and that his actions towards the defendant at the time were such as to create in the mind of the defendant a reasonable belief that he was in imminent danger of being shot by Hugh Warren, with such gun, through his coat pocket, and reasonably believed that he was in imminent danger of death or serious bodily harm by the discharge of such gun by said Hugh Warren, he was under no obligation either to retreat or to endeavor to use any other means of protection, but had the lawful right in the protection of his person to shoot and kill said Hugh Warren, even though it was afterwards determined that Hugh Warren was not in fact armed, but that the danger of death or serious bodily injuries at the hand of Hugh Warren was real but only apparent to said defendant."

No. 41. "To justify killing in self defense there need be no actual or real danger to the life or person of the party killing, but there must be or reasonably appear to be at or immediately before the killing some overt act of the person killed which, either by itself, or coupled with words, facts or circumstances, then or theretofore occurring, reasonably indicate to the party killing that the person slain is at the time endeavoring to immediately to endeavor to kill him or inflict upon him great bodily harm and he must honestly believe, upon reasonable grounds, that he is in imminent danger of such death or great bodily harm."

No. 42. "It is not necessary however to justify the use of a deadly weapon that the danger be actual. It is enough that it be an apparent danger, such an ap-

pearance as confronting a reasonable person would induce him to believe that he was being assailed and that he was in immediate danger of death or great bodily harm, at his assailant's hands. Upon such appearance one may act with safety, and will not be held accountable, though it should afterwards appear that the indications upon which he acted were wholly fallacious and that he was in no actual danger."

The appellant further complains that his plea of insanity was overlooked in some of the instructions given. There was no evidence whatever to support that plea, unless it be considered that the jury had the right to infer that the defendant was insane from the extraordinary fury of his attack. Even if that be so, the matter was more than adequately covered. Several instructions were given on the point, and, among them, instruction No. 34, which reads as follows:

"You are instructed that a defense of insanity, if established and proven, is permissible and good under the laws of this state. It must be shown, as already stated, by the defendant, by a fair preponderance of all the evidence, and that the mental condition of the defendant at and just prior to the doing of the act or things charged in the information, was such that he could not distinguish between right and wrong, as to such acts and things charged. The true test of insanity or lack of it being the mental capacity and ability, or lack of it, to understand the difference between right and wrong and to act accordingly with reference to the subject matter involved."

We venture to say that probably few defendants pleading insanity have had the benefit of such an instruction as No. 55:

"If you find by a preponderance of the evidence that after the defendant fired the first shot or shots into the body of Hugh Warren that the defendant temporarily lost his reason to the extent that he was incapable of distinguishing between right and wrong or realizing that he was continuing to discharge the gun, but are

not satisfied beyond a reasonable doubt whether the shots that killed Hugh Warren were fired before or after he lost his reason, then I instruct you to find defendant not guilty on the ground of insanity."

The trial judge gave sixty instructions. The appellant's exceptions to his failure to give some twenty others cannot be taken up seriatim and can only be dealt with generally.

In addition to defining the crime charged and analyzing the charge into its separate elements and instructing the jury that each element must be proved beyond a reasonable doubt, defining that term and stressing the presumption of innocence, the trial judge gave detailed instructions concerning the special pleas of self-defense and insanity, and the usual stock instructions confining the attention of the jury strictly to the evidence and warning each individual juror against surrendering his convictions for the purpose of arriving at a verdict. He also specifically withdrew certain testimony, item by item, which had been ordered stricken during the trial, told the jury that the fact that the defendant had no license to carry firearms, if they found it to be a fact, should not be considered to his prejudice; that, when facts appeared equally consistent with innocence or guilt, the innocent interpretation should always be adopted; that no prejudice should be engendered by the gruesome photographs which were introduced in evidence; that the jury had no right to disregard the testimony of the defendant simply because he was charged with a serious crime; that, if they believed that Warren had made threats to kill the defendant, such threats entitled the defendant to interpret the acts of the deceased more harshly than would otherwise be the case; and that the immediate and voluntary surrender of the defendant was a circumstance in his favor. There were still

other cautionary instructions, but sufficient has been said to show that the instructions as given were comprehensive; and that they were, when considered as a whole, not unduly unfavorable to the accused, may, perhaps, be inferred from the fact that the words "reasonable doubt" appear therein no less than thirty-two times.

During the six or seven days in which the evidence was being taken, the prosecuting attorney conducted the state's case with commendable fairness. The record is replete with instances where he checked witnesses who were about to volunteer statements favorable to his case, and other instances where he was unable to do so, and in these instances, without waiting for objection by the defendant, he invariably moved that the testimony be stricken and the jury be instructed to disregard it. In his closing argument, unfortunately, he used language of such character and import as to present a very serious question. The statements complained of, the exceptions taken thereto, and the ruling of the court were as follows:

"If you find the defendant guilty of murder in the first degree, it then becomes your duty to consider whether or not the death penalty shall be imposed. No one else has anything to say about that. It is not in the discretion of the Court, that is the function of the Jury whether he shall be executed or not. It is a solemn thing to ask a Jury to impose the death sentence on any other human being. But the law throughout the ages, among all countries, all races of men, has been that the only appropriate punishment for certain crimes is death.

"We have here a man who took the wife and the home,—she went to him, who caused the break in that family, and who finally went out gunning for his former friend. Now, Hugh Warren would have been just as dead if he had only shot him once or twice. The coroner testified that every shot was a mortal wound and would have caused death. But he didn't do that. He

didn't just shoot him once or twice and walk away; he emptied that gun into the face of that defenseless body.

"Like most killers, he is cowardly now. He doesn't want to face the penalty, but I want to tell you this: he has had a fair trial. He has had a hand in picking the Jury. He has been represented by able counsel. He has had a chance to testify and to bring witnesses here. He has been clothed with the presumption of innocence and he has been tried by a Jury of perfect strangers. I think every one of you testified that you knew neither Buttry nor Warren nor anyone connected with the case. He couldn't have had a fairer trial.

"Now, after a fair trial such as he has had and you find him guilty, just consider the kind of a trial he gave Hugh Warren. He didn't give him a Jury trial before he executed him. He didn't give him a trial by Jury or allow any argument or any speeches or pleas for mercy. He took him out there and shot him just as you would shoot a dog, but you wouldn't empty that many bullets in a dog.

"I said, 'What did Warren say just before you shot him?'

" 'Nothing was said except Warren said he wasn't going to go any further, didn't have to talk to him.' That is the kind of a trial that Paul Buttry gave to this little man whose home he had broken up.

"Ladies and Gentlemen of the Jury, I urge upon you that the death penalty should be inflicted. We have here a man who is vicious, you know he is a killer, there is only one sure way of insuring that he won't be out among decent men and women again, don't leave this thing to the whim of some future governor or parole board. There are men and women who testified here against him, Mr. and Mrs. Davies, Mr. Toler, Paul and Silas Warren, a lot of those people are old acquaintances of his. You have a very serious responsibility for their future well-being. If he walks forth again among men,—he has killed once. That is all I am going to say to you.

"I thank you for your very patient attention. I have

tried to give all the facts to you and I am sure you will do your duty. I thank you.

"Mr. Cross: Your Honor, at this time, I desire to take exception to that part of the closing remarks of counsel that in determining what penalty should be inflicted in the event of conviction of murder in the first degree that the Jury should take into consideration the fact that he had broken up the home of Hugh Warren; also the statement in determining what penalty should be inflicted, the Jury should take into consideration some of the witnesses who testified, the names of which were mentioned by him in his closing statement for the reason that such remarks are highly improper and prejudicial to the defendant, and are matters that should not be taken into consideration by the Jury in determining what penalty, if any, should be inflicted upon the defendant.

"At this time, the defendant moves the Court to instruct the Jury to entirely disregard and not allow their minds to be inflamed or prejudiced nor their verdict to be determined with reference to the matters that I have just related in my exception and objection.

"The Court: The Jury has been instructed very fully in this case.

"Mr. Cross: Exception.

"The Court: Exception will be allowed."

There are many opinions in the law reports of our sister states, and a considerable number in our own, dealing with similar situations; but individual cases are of but little use as precedents, because the alleged prejudicial statements with which the opinions deal are never the same, and also because the factual situations which provoke the statements always differ. It may, for example, be highly prejudicial to speak of a defendant as "a red-handed murderer," upon one set of facts, and merely bad taste, on another. It is because the question as to whether or not the language complained of is prejudicial depends primarily upon the evidence in the case that we have been compelled, in preparing this opinion, to make a long and tedious

recital of the evidence. However, certain general principles may be deduced from the decisions considered as a whole.

■ If the evidence indicates that the defendant is a murderer or killer, it is not prejudicial to so designate him.

"Whether he was a murderer and an assassin was the very question which was on trial, and we do not consider it improper for the district attorney, in the course of his argument, to make a statement to the jury which amounted to nothing more or less than an expression of his opinion that defendant was guilty." *Bishop v. Commonwealth,* 109 Ky. 558, 60 S. W. 190.

Nor is it prejudicial to refer to a defendant as "a red-handed murderer" where the charge is murder, and the state's evidence strongly tends to establish that the defendant is guilty of the charge. *State v. Evans,* 145 Wash. 4, 258 Pac. 845.

■ It is undoubtedly the right, and, indeed, the duty, of the prosecuting attorney to urge the jury to fix the penalty of death in a case where the evidence strongly tends to show a ruthless and cold-blooded murder. *Lawler v. Commonwealth,* 182 Ky. 185, 206 S. W. 306. And, in arguing the reasons why that penalty should be imposed, he should be given considerable latitude, provided he keeps within the evidence.

"While intemperate assertions of opinion not based upon any evidence will never be tolerated, it is none the less in the interest of a sound public policy that prosecuting officers be permitted a reasonable latitude in argumentative deduction from the evidence." *State v. Peeples,* 71 Wash. 451, 129 Pac. 108, quoted with approval in *State v. Evans, supra.*

It is said, in a recent opinion (1936) in the case of *Sullivan v. State,* 47 Ariz. 224, 55 P. (2d) 312:

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks."

 The appellant's own testimony, and that of other witnesses called for his defense, particularly that of Catherine Warren, raised a very strong probability that the defendant was the cause of the separation and the divorce of the Warrens, and, although that was not the dereliction charged, it was inextricably interwoven with the homicide, and, if true, added to the enormity of the offense. It was a matter which the jury was justified in considering, and, therefore, one which the prosecutor was justified in calling to their attention.

 There are cases which hold that, where the prosecutor suggests that, if the death penalty be not inflicted, the accused may be soon released by some future governor or parole board, a conviction should be set aside and a new trial granted. But the great weight of authority is to the contrary, especially where the prosecutor does not attempt to state statistical facts, but, as the prosecutor did in the case at bar, merely suggests such a possibility.

"The declaration by the prosecutor that, if the prisoner were sentenced to life imprisonment, he would be liberated in a few years, and would return home to enter upon a new course of crime, was no statement of fact bearing on the guilt of the accused, but a mere expression of opinion or guess, which the intelligence of the jury would rate only as such. And, indeed, was it a reprehensible opinion? The jury was the sole judge whether the prisoner should die or suffer lifelong imprisonment, as the law lodges that dis-

cretion with it. By what considerations is the jury to exercise this discretion? Certainly, it can look at the hue of the crime as revealed by the evidence; and can not the jury consider whether the circumstances of the crime show its perpetrator to be a desperate man, and an enemy of society, and dangerous, should he escape or be pardoned?" *State v. Shawn,* 40 W. Va. 1, 20 S. E. 873.

For additional examples of this class of cases, see: *McNeill v. State,* 102 Ala. 121, 15 So. 352, 48 Am. St. 17; *Wechter v. People,* 53 Colo. 89, 124 Pac. 183; *State v. Junkins,* 147 Iowa 588, 126 N. W. 689; *Bolin v. Commonwealth,* 206 Ky. 608, 268 S. W. 306.

Many jurisdictions, including our own, have held it not reversible error if it be stated in argument that the average term of a man sentenced to life imprison-ment in the penitentiary is not more than eight years, or that it is a matter of common knowledge that life sentences mean only ten or twelve years in prison, even though there is no evidence to that effect in the record. In *Sullivan v. State, supra,* the court said, in part:

"But were the remarks of the county attorney, as set forth in the motion for new trial, such as to require a reversal of the case? It is alleged (a) that he referred to the defendant, in his argument, as 'nothing but a low down murderer,' and (b) that he requested the jury to fix the penalty of death rather than life imprisonment, because the average prisoner sent up for life only serves on an average of eight years, and that, if the defendant received a life sentence, he would probably be paroled in eight years and thrown on society to kill and murder again."

It was held that these remarks did not constitute reversible error. See, also, *State v. Stratton,* 170 Wash. 666, 17 P. (2d) 621, and the very recent (1938) opinion of this court in *State v. Knapp,* 194 Wash. 286, 77 P. (2d) 985.

In jurisdictions where a verdict of guilty in the first degree results automatically in sentence of death, unless the jury specifically recommends imprisonment for life, it is quite common for juries to come back into court and ask for an instruction as to whether, if the life sentence be recommended, the defendant can afterwards be pardoned or paroled. An instruction that he can be pardoned and paroled, given under such circumstances, is held not to be prejudicial. *Liska v. State*, 115 Ohio St. 283, 152 N. E. 667; *State v. Carroll*, 52 Wyo. 29, 69 P. (2d) 542; 51 Harvard L. R. 353.

It has been said by the supreme court of New Jersey that whether the defendant can be pardoned, if given a life sentence, is "naturally one of the elements to be considered by the jury" in determining whether sentence of death or life imprisonment shall be imposed, and that there is no reason why it should not be instructed in the first instance as to the existence of the parole and pardoning power. *State v. Rombolo*, 89 N. J. L. 565, 99 Atl. 434; *State v. Carrigan*, 93 N. J. L. 268, 108 Atl. 315.

In our opinion, the most serious question presented by this assignment arises out of the fact that the prosecuting attorney told the members of the jury that they had a very serious responsibility for the future well-being of certain witnesses, naming them. But, if it be permissible to argue that the evidence shows a defendant to be so vicious and depraved that he should be hung, lest, if given a life sentence, he may escape or be pardoned or paroled and commit other crimes—and we have found that the courts so hold—is it reversible error to suggest certain possible motives which he might have for so doing? The prosecuting attorney did not purport to state any fact in this connection, but only possibilities, and, in the light of the evidence, possibilities not wholly fantastic. Is

it conceivable that the jury could have considered his statement in this regard as anything more than mere speculative argument? In our recent decision in *State v. Knapp, supra,* it is said, quoting from *State v. Figlenski,* 169 Wash. 38, 13 P. (2d) 5:

" 'Jurors possess at least average intelligence and integrity, and they are sworn to return a verdict in accordance with the law and the evidence.' "

And, we may add, they are also instructed to do so.

In a case where misconduct of counsel was in question, the supreme court of appeals of West Virginia said:

"Must we not attribute intelligence and discrimination to juries? They are capable of discarding improprieties. It would be impossible to carry on judicial proceedings upon the theory that everything, even if somewhat improper, that reaches the ears of jurors, affects their final determination beyond all power of resistance on their part." *State v. Shawn,* 40 W. Va. 1, 20 S. E. 873.

It must also be taken into consideration that we have none of the argument before us which was made on behalf of the appellant by his attorney, but only certain passages culled from that of the prosecuting attorney. Some years ago the supreme court of Missouri well said, in a case which has been much cited and quoted:

"The trial judge, who had heard the speeches of opposing counsel, and knew what, if anything, was said to provoke the last remarks of counsel in his closing speech, was in a better position than we are to determine whether he should or not interfere, and as to when, how, and to what extent a trial judge may interfere in any case, must depend upon the exercise of a sound discretion." *Huckshold v. St. Louis, I. M. & S. R. Co.,* 90 Mo. 548, 2 S. W. 794.

The instant case was tried before a trial judge of long experience. He not only heard all that was said

by both counsel, but was in a position to observe the manner in which they said it. It comes here on appeal after he has twice signified that, in his opinion, the remarks of the prosecuting attorney were not prejudicial, first, when in response to counsel's demand that he instruct the jury to disregard them, by saying: "The jury has been very fully instructed in this case;" and later, when, after hearing a full and complete argument on the whole matter, he denied the appellant's motion for a new trial.

We think the closing words of the opinion of this court in *State v. Stratton,* 170 Wash. 666, 17 P. (2d) 621, an opinion which we have since approved and which has been cited with approval in a number of other jurisdictions, may be appropriately used in the disposition of the assignment under discussion:

"The convincing effect of the evidence against the appellant, contributed to substantially by himself, independent of any argument on the part of the prosecuting attorney, clearly justified and manifestly brought about the verdict. The trial court, believing the trial was without error, prejudicial or otherwise, denied the motion for a new trial."

The judgment and sentence appealed from is affirmed.

BLAKE, C. J., MAIN, JEFFERS, and STEINERT, JJ., concur.