[No. 27484. Department One. June 30, 1939.]

THE STATE OF WASHINGTON, *Respondent*, v. EARL TALBOTT, *Appellant*.[1]

[1]Reported in 91 P. (2d) 1020.

*Judd D. Kimball* and *Cameron Sherwood,* for appellant.

*Glenn L. Bean, A. J. Gillis,* and *E. W. King,* for respondent.

ROBINSON, J.—On August 9, 1938, at about 2:30 p. m., the body of W. E. McKinney was found concealed under a pile of rubbish behind the buildings on the McKinney ranch, near Waitsburg, Washington. Mr. McKinney was born on this ranch some few years after his father homesteaded the land in 1863. At the time of his death, he was living there, with no companion other than his dog. There was a deep scalp wound above his left ear, and a gunshot wound in each temple. The condition of the body indicated that he had been dead about five hours. A search of the premises revealed that his automobile was missing; also, his saddle, bridle, three shotguns, and his dog.

A description of the car was broadcast by police radio. At about 8:30 that evening, an officer of the Oregon state police discovered the automobile in the possession of a young girl, at Milton, Oregon. When asked where she got the car, she said she had borrowed it from her boy friend, Earl Talbott. He was immediately picked up at a nearby cabin camp and held for the sheriff of Walla Walla county. He told the arresting officer that the car belonged to a cattle buyer named Healey.

Talbott was but eighteen years of age and lived with his divorced mother at Waitsburg. When questioned by a deputy prosecutor, he at first told a detailed story to the effect that he had been hunting that morning along the Touchet river, and, when he came out on the road, an acquaintance named Healey happened along in an automobile and asked him to go with him to Starbuck and Dayton. After making that trip, they came back to Waitsburg, where Talbott changed clothes, and they then went to Walla Walla. Healey had to go to Ellensburg, but left his car with Talbott, upon his promise to return it to him at Walla Walla the next morning. Talbott drove down to Milton to spend the night. He was questioned at length and became involved in discrepancies and contradictions. Finally, he gave a very different account of his acts on the morning of August 9th. This account was, in substance, as follows:

He had gone hunting that morning with a .22 rifle, which he had purchased three days before. As he went along the Touchet river, he came into the vicinity of the McKinney ranch. He had worked there as a harvest hand for some days just previously and, while so employed, saw some articles about the premises which he greatly desired, and thought if he went there he might be able to get them. However, Mr. McKinney was at home. They walked around the place and talked for an hour or so. Finally, McKinney sat down on the platform of a four-wheeled wagon style trailer, which was standing in the machinery shed. Talbott picked up a pair of very heavy pliers, which were lying on the trailer, and suddenly, as he held them in his hand, it occurred to him "to knock McKinney out." He struck him a hard blow on the side of the head. McKinney fell back on the trailer platform unconscious and bleeding profusely. Talbott

had struck him a harder blow than he intended, and concluded that he had better "finish him off." He picked up his rifle, which was standing in the corner of the shed, and shot McKinney just back of the left eye, then walked behind the trailer, and shot him in the other side of the head.

He then tried to run the trailer down a cattle path in the direction of the river, but it got out of control on the steep grade, and the body was thrown off. He covered it with some boards, old automobile fenders, and odds and ends of lumber from a nearby rubbish pile, went back to the garage, took out the automobile, pumped it full of gas, took the guns from the house, and the saddle and bridle from the garage. Finally, he put the dog into the car, not because he wanted him, but with the idea that, if any neighbor came to the ranch and found the dog there, he might look around for his master, but, finding both absent, would suppose that McKinney had gone on a trip and had taken the dog with him. In this way, he hoped to have four or five days in which to get away.

Having put the various articles in the car, he drove to his mother's house in Waitsburg, telling her the car belonged to a friend, changed clothes, left his rifle and one shotgun at his mother's, and drove south towards Walla Walla and Oregon. He stopped at his father's and left the saddle and another shotgun. South of Walla Walla, he put the dog out of the car. All of these articles were subsequently found at the places indicated. The third shotgun was in the car when he was arrested. After telling this story several times, he was taken to the ranch, and there, with the pliers and the rifle, reenacted the killing in the presence of the sheriff, prosecuting attorney, and several other witnesses. Photographs of this grim demonstration are in the record.

The appellant was informed against in two counts: The first, charging murder in the first degree while engaged in committing, attempting to commit, or in withdrawing from the scene of the commission of a felony; the second, charging murder in the first degree, with premeditated design. The court appointed counsel for his defense. They interposed the formal plea of not guilty, and a special plea of not guilty because of insanity. The defendant's indifference to the whole matter was so pronounced as to give the insanity plea considerable plausibility, and there was considerable evidence assembled to support it.

It was shown at the trial that the boy came from a low-grade home. His father had both suicidal and criminal tendencies, and had frequently taken the boy on wheat-stealing expeditions. The defendant's great-great-grandfather went insane, and there had been insanity in collateral branches of his father's family. At the time of the killing, one of Talbott's sisters had the mental capacity of a child of three, although she was fourteen years old. He did not like to play with other boys, and did not show much affection for the other members of his family.

On the other hand, he was of an entirely peaceable disposition. He had finished grade school at the usual age of fourteen, having passed the seventh and eighth grades in one year. After that, he largely supported himself. He had just finished a job with a harvesting crew, acquitting himself as an "A-No. 1 header man." Some of his associates did not think him in any way abnormal, but there is much evidence that, during his boyhood, he did not like to associate or play with other children and showed no affection for his relatives. His mother testified that, as to all other matters, he seemed like other boys of his own age.

Dr. Edward Hoedemaker, of Seattle, was called as

an expert for the defense, although compensated for
his services by the state. As the ultimate fate of the
defendant rests largely upon his opinion, it may be
well to mention that his qualifications were shown to
be of a high order, he having at one time served for
two years as a specialist in neurology and psychiatry
at the University of Pennsylvania, and for three years
as chief surgeon in neurology and psychiatry at the
Pennsylvania General Hospital. This experience had
been supplemented by six years of private practice
in Seattle. Dr. Hoedemaker had two long interviews
with the accused, and other interviews with eight or
ten people who had known him well, including his
relatives.

Talbott related the story of the killing to Dr. Hoede-
maker without any appearance of shame, remorse, or
regret, although he said he knew what he did was
wrong, and that he would not know what to say if
he met any members of the McKinney family. Other-
wise, he did not show the least concern over the
matter, nor did he appear worried about the probable
consequences to himself. From the expert's testimony,
we can readily give full credit to an off-the-record
statement, made by one of appellant's counsel during
the argument on appeal, to the effect that, during the
trial, young Talbott was the least concerned about its
result of anyone in the courtroom. He was, and is,
obviously, very abnormal, and does not react as other
persons do.

Dr. Hoedemaker came to the conclusion that the
defendant, at the time of the killing and at the time
of the trial, was in a pre-psychotic state, showing defi-
nite tendencies towards dementia praecox, but clearly
stated that he could not be said to have reached that
stage. We quote briefly from his testimony:

"He is dangerous to be at large from a medical standpoint. But from a legal standpoint he is competent and knows what he is doing, and knows the difference between right and wrong. He, in the opinion of the examiner, knew the difference between right and wrong, at the time he committed his act."

If the jury accepted that opinion—and it could not reasonably reject it, since it came from a highly qualified source and was wholly undisputed—it could not find the defendant not guilty by reason of insanity without flatly disregarding the court's instructions, which were, in part, as follows:

"You are instructed that every unsound condition of mind does not constitute legal insanity or mental irresponsibility. A person is responsible for his acts if he has sufficient mental capacity at the time of the commission of the act to comprehend what he is doing and distinguish right from wrong with reference to such act. . . .

"If the defendant is to be acquitted upon his plea of mental irresponsibility or insanity, he must convince you by a preponderance of the evidence that at the time the crime is alleged to have been committed, his mind was diseased to such an extent that he was unable to perceive the moral qualities of the act with which he is charged, and was unable to tell right from wrong with reference to the particular acts charged. . . ."

The jury not only found the defendant guilty, but answered "Yes" to the question: "Shall the death penalty be inflicted?"

■ Appellant's counsel have assigned and argued three claims of error. The jury returned a verdict of murder in the first degree without specifying whether it related to the first or second counts, or to both. It is contended that the verdict is, therefore, void for uncertainty. We think there is no merit in this contention. The two counts do not charge different of-

fenses, but merely charge the same offense in different ways, and the evidence in the case was amply sufficient to convict on either or both theories. *Rhea v. State,* 63 Neb. 461, 88 N. W. 789, 799. See, also, 16 C. J. 1105, § 2593, and cases cited in footnotes 12 and 13.

With respect to the first degree murder charge, alternative forms of verdict were sent to the jury room. In one of these, the word "Guilty" was written in capitals, and the word itself underscored. In the other, the words "Not Guilty" were written in capitals, but, through some inadvertence, they were not underscored. It is argued that, since the members of the jury knew, or had the right to suppose, that these forms were prepared by the trial judge, they may have felt that the underscoring of the word "Guilty" indicated his views as to the guilt or innocence of the accused. It is said that, at all events, this court cannot say that this was not the case. We think, however, that we can at least say, and should say, that it cannot be thought to have influenced their decision as to the question of appellant's guilt or innocence. The guilt of the appellant was made so thoroughly apparent by the evidence that it is unthinkable that so small a circumstance could have influenced the jury's verdict on that question, if, indeed, the difference in the two forms of verdict complained of ever came to its notice. In fact, the appellant's guilt, the special plea not having much support, was admitted at the close of the trial and during the argument to the jury, and necessarily so, for it could not reasonably be disputed.

After the evidence had been taken, the question, "Shall the death penalty be inflicted?" stated the only live issue remaining in the case. It was therefore natural that counsel for both the appellant and the state should argue that question at some length. In so doing, an incident occurred which is made the basis

of a third assignment of error. The trial judge has certified as follows:

"That Mr. Judd Kimball and Mr. Cameron Sherwood, attorneys for the defendant Earl Talbott, in portions of their arguments to the jury on behalf of the defendant, conceded the defendant killed Mr. McKinney and conceded that defendant was guilty of murder and did not argue for an acquittal, but, referring to the testimony of Dr. Edward Hoedemaker wherein Dr. Hoedemaker testified that in his opinion the condition of defendant Earl Talbott was such that it was dangerous for him to be at large, thereupon argued that defendant's condition might become worse at any time, and that, therefore, he should not be acquitted and released but should be given life imprisonment, but strenuously insisted that he should not be hanged, and counsel for defendant further argued that the evidence was insufficient to show premeditation;

"That during the state's argument to the jury by Mr. Glenn L. Bean, Prosecuting Attorney, he said, in substance, 'You will remember that a life sentence in the penitentiary does not always mean life—you all know that if he is given life—'; that as the last words of the above quoted statement were said by Mr. Bean, Mr. Sherwood, one of the attorneys for the defendant objected to the statement upon the ground that it was improper argument, was prejudicial to the cause of the defendant and contrary to the Court's instructions to the jury, and further requested that the court instruct the jury to disregard this statement; that immediately upon objection being made and before the reasons therefor were given, the court stopped Mr. Bean and upon the reasons for the objection being given, sustained the objection and instructed the jury to disregard the remarks, . . ."

The prosecuting attorney's conduct, as thus revealed in the record, is relied upon as error, calling for a new trial, even though the jury was duly instructed to disregard his brief and incomplete remark. We do not think it necessary to discuss this assignment in view

of what is said regarding a much more serious occurrence of this kind in the very recent opinion in *State v. Buttry*, filed in this court on June 1st and reported *ante* p. 228, 90 P. (2d) 1026. We refer counsel to that opinion and the cases therein cited. We find no merit in any of the three assignments of error.

It is unusual, in an appeal in a capital case, to find no errors assigned as to the admission or rejection of evidence, or as to the giving or refusal of instructions. We have carefully read all the evidence and have examined the instructions, and we find from such reading and examination that no errors of that description could have been justly claimed. The trial was conducted with the utmost regard for the rights of the accused. He was earnestly defended at the trial with outstanding skill and fidelity by counsel appointed by the court. After the trial was concluded, they procured an order from the trial judge authorizing this appeal at the expense of the state, and the matter was ably argued in this court, both orally and through printed briefs.

Finding no error in the record, the judgment and sentence appealed from is affirmed.

BLAKE, C. J., MAIN, STEINERT, and JEFFERS, JJ., concur.