[No. 44705. En Banc. January 5, 1979.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL CHARLES GREEN, *Appellant.*

*Timothy K. Ford, Smith, Kaplan, Withey, Ford, Theiler & Sowa, John Strait,* and *Anthony Savage,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *J. Robin Hunt, Deputy,* for respondent.

HAMILTON, J.—This is a direct appeal by a defendant convicted of aggravated murder and sentenced to death. We affirm the conviction but remand for reimposition of sentence.

The appellant Green was charged with the murder of an 8 1/2-year-old girl, Kelly. The factual setting as necessary to an understanding of the issues may be described briefly.

In the early evening of September 28, 1976, Kelly took a younger child for a short walk along an alleyway adjacent to an apartment house in the Capitol Hill area of Seattle. Approximately 10 minutes after the two children left for

the walk, screams were heard by adults within and without the apartment house. Then, another youngster reported Kelly was injured. The mother of the child who had been with Kelly investigated; when she did she observed her child in the alleyway unharmed, standing near a pool of blood. A butcher knife was nearby. Picking up her child, she went to look for Kelly.

Meanwhile, a resident of an apartment who had heard the screams looked outside. From a vantage point on the balcony of his apartment, he could see two figures huddled in the alleyway directly below. He recognized Kelly. The other figure, an adult, lifted Kelly up off the ground. She was kicking and screaming. This witness also observed the individual place his hand over her mouth in an apparent effort to muffle the noise she was making.

Within moments, Kelly was carried out of the witness' sight as the individual holding her turned the corner of the building. A few seconds later, the witness exited his apartment, ran downstairs, and observed the appellant who was now located in a recessed stairwell at the rear of the apartment house. He was holding Kelly. Appellant's clothes were covered with blood; Kelly's were ripped away from her body. She was pale and quiet. He asked appellant what he could do to help and was requested to call an ambulance. As he did so, appellant took Kelly's body to the apartment lawn where he set it down.

Shortly thereafter, the police arrived on the scene and spoke with appellant. He gave the police a description of a person he claimed to have observed assaulting Kelly. The description was broadcast by the police and a search of the general vicinity was initiated. In addition, appellant explained why he moved the body onto the lawn. As yet, appellant had not been identified as the person in the alley with Kelly.

The officers transported appellant to the police station in order to obtain his statement. Appellant went along without objection. While appellant was at the station, the on-the-scene investigation continued. Another witness, a 13-

year–old boy, came forward and provided a new description of Kelly's assailant. This new description closely matched appellant's.

Meanwhile, a detective had obtained appellant's statement, which included an unusually minute description of the person appellant asserted he observed assaulting Kelly. After the statement was completed, the detective asked appellant to remove his clothing so the blood on it could be typed. When appellant did so, the detective noticed blood on his undershorts, a spot too large, he thought, to have soaked through appellant's pants. At approximately the same moment, word reached the detective that a witness had described appellant as the individual who was struggling with Kelly in the alley. Only then was appellant advised of his *Miranda* rights and arrested. He was charged with aggravated murder.

At trial, the State's theory was that appellant stabbed Kelly, killing her in the course of kidnapping or rape. At the close of the State's case, appellant made several motions to dismiss, which the court denied. He then rested. The jury returned a verdict of guilty, and under Washington law the death penalty was mandatorily imposed.

Appellant argues: I. The court should have suppressed his statement to the detective as it was the product of a custodial interrogation conducted without prior *Miranda* warnings; II. The trial court should have granted his motion to dismiss the information, as the statutory scheme created by RCW 9A.32.030(1)(c)(2) and (5) and RCW 9A.32.045(7) violates equal protection; III. The trial court erred by permitting the jury to convict if it found the killing occurred in the course of rape *or* kidnapping; IV. The mandatory death penalty is unconstitutional.

I

■ Appellant argues the statement he gave to the Seattle police detective should have been suppressed since it was the product of custodial interrogation conducted without prior advice of rights. *Miranda v. Arizona,* 384 U.S.

436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). He argues custodial interrogation should include all station house questioning, relying on *State v. Creach,* 77 Wn.2d 194, 461 P.2d 329 (1969), and *State v. Vining,* 2 Wn. App. 802, 472 P.2d 564, 53 A.L.R.3d 390 (1970).

In *Creach,* the defendant was asked to step outside a hotel and answer some questions. The issue was admissibility of the statements made in response to those questions. We held the statements were admissible because the questioning was during the course of a routine investigation. Although we quoted from *United States v. Gibson,* 392 F.2d 373 (4th Cir. 1968), we did not adopt the view expressed therein that station house questioning is per se custodial interrogation as suggested in *State v. Vining, supra* at 806.

In *Creach,* and recently in *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977), we recognized the difficulty inherent in establishing an all–inclusive rule by which to judge the need for *Miranda* warnings, but we held that:

> [O]nce an investigating officer has probable cause to believe that the person confronted has committed an offense, the officer cannot be expected to permit the suspect to leave his presence. *At that point,* interrogation becomes custodial, and the suspect must be warned of his rights.

(Italics ours.) *State v. Creach, supra* at 198, quoted with approval in *State v. Hilliard, supra* at 435.

Probable cause to arrest arises when there is reasonable ground for suspicion, supported by circumstances within the knowledge of the arresting officer, which would warrant a cautious person's belief that the individual is guilty of a crime. *State v. Hilliard, supra; State v. Parker,* 79 Wn.2d 326, 485 P.2d 60 (1971). Thus, mere suspicion before the facts are reasonably developed is not enough to turn routine investigatorial questioning of a witness into a custodial interrogation. *State v. Hilliard, supra; see Oregon v. Mathiason,* 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977) (per curiam).

Appellant gave a statement to police without being advised of his rights under *Miranda*. At the time he did so, he was located at a police station; however, there is no evidence to indicate his presence there was involuntary. Further, the testimony indicates it was routine procedure to take material witnesses to the station in order to record their statements. At the time appellant arrived at the station, the evidence possessed by police was insufficient to warrant a cautious person's belief that appellant had committed the crime involved. Whatever general suspicions the officers may have felt were as yet unsupported by circumstances which would have given rise to probable cause. Therefore, it is reasonable to assume appellant was free to leave. When, however, the appellant removed his clothes and the detective observed blood and was informed that a person answering appellant's description had been seen struggling with Kelly in the alley, the facts then supported a reasonable belief appellant committed the crime, following which he was appropriately advised of his *Miranda* rights.

Thus, we hold the questioning of appellant, prior to the time he removed his clothing and the detective received the description, was part of a general investigation and was not custodial interrogation. His statement to police was accordingly admissible since the interrogation was not conducted in violation of *Miranda*.

## II

Appellant next urges the information against him should have been dismissed at the outset of trial, because, based upon the same set of facts, the prosecutor could elect to charge either aggravated murder under RCW 9A.32.045(7) (penalty: mandatory death) or felony–murder under RCW 9A.32.030(1)(c)(2) and (5) (penalty: life imprisonment). He claims unfettered charging discretion in effect allows the prosecutor to seek varying degrees of punishment for different persons who commit identical crimes. This, he

asserts, denies equal protection of the law. *Olsen v. Delmore,* 48 Wn.2d 545, 550, 295 P.2d 324 (1956); *State v. Zornes,* 78 Wn.2d 9, 475 P.2d 109 (1970); U.S. Const. amend. 14, § 1, and Const. art. 1, § 12.

The first–degree felony–murder statute, in pertinent part, states:

(1) A person is guilty of murder in the first degree when:

. . .

(c) He commits or attempts to commit the crime of either . . . (2) rape in the first or second degree, . . . or (5) kidnaping, in the first or second degree, and; in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants;

. . .

RCW 9A.32.030(1)(c)(2) and (5).

The aggravated murder statute states:

A person is guilty of aggravated murder in the first degree when he commits murder in the first degree as defined in RCW 9A.32.030 under or accompanied by any of the following circumstances:

. . .

(7) The defendant committed the murder in the course of or in furtherance of the crime of rape or kidnaping or in immediate flight therefrom.

RCW 9A.32.045(7). (Initiative Measure No. 316 § 1.)

It is a fundamental principle of constitutional law that no person shall be subjected for the same offense to any greater or differing punishment from that to which others may be subjected. *Olsen v. Delmore, supra; State v. Zornes, supra.*

■ In this case we are faced with two statutes, one which generally defines first–degree felony–murder and another later initiative measure which treats two types of felony–murder more specially by defining those types as aggravated murder. *See* RCW 9A.32.030(1)(c)(2) and (5); RCW 9A.32.045(7). Generally speaking, special statutes have the effect of qualifying more general enactments.

*Wark v. Washington Nat'l Guard,* 87 Wn.2d 864, 557 P.2d 844 (1976).

▉ By passing the initiative measure, the voters intended to identify those crimes which are particularly outrageous to society and to elevate the status of such crimes. We have evidence of this intent since it is expressed in the statement in favor of the initiative contained in the Official Voters Pamphlet 6 (1975).[1] And those statements may be considered in determining the purpose and effect of an initiative. *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 182 P.2d 706 (1947); *Lynch v. Department of Labor & Indus.,* 19 Wn.2d 802, 145 P.2d 265 (1944).

▉ The clear effect of the voters' action was to *qualify* and supplement the existing statute, RCW 9A.32.030. By passing the initiative and qualifying the statute, the voters thus, in essence, enacted a statute which does not repeal but rather overlays, supplements, and incorporates by reference[2] RCW 9A.32.030(1)(c)(2) and (5). It makes murder, as defined in pertinent subsections of RCW 9A.32.030, and which occurs in the course or furtherance of rape or kidnapping, a distinct and separate crime, *i.e.,* aggravated murder. Such crimes are subject to enhanced punishment. RCW 9A.32.046. Thus, while the language of RCW 9A.32-.030(1)(c)(2) and (5) may be used definitionally, where the facts and circumstances support murder in the course of

---

[1] "Initiative 316 would serve several vital social functions. It would provide a deterrence to the would-be murderer; it would identify those crimes specified in Initiative 316 as particularly outrageous to society; and it would serve to reinforce society's concern for the dignity and value of innocent human life." Official Voters Pamphlet 6 (1975).

[2] Analogous principles are found in other areas of law. We have previously recognized the existence of both overlay and reference statutes. In *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 525 P.2d 774 (1974), we held that the State Environmental Policy Act of 1971 (RCW 43.21C) was supplementary and overlaid existing law. In *Knowles v. Holly,* 82 Wn.2d 694, 513 P.2d 18 (1973), we recognized the legal effect of reference statutes. We stated the terms to which reference is made are to be treated as if incorporated into the referring act, just as completely as if they had been explicitly written therein. *See State ex rel. Toll Bridge Authority v. Yelle,* 32 Wn.2d 13, 200 P.2d 467 (1948).

first– or second–degree rape or kidnapping, the prosecutor, by virtue of the distinct effect of the voter initiative, is left with no discretion but to charge aggravated murder. Accordingly, we discern no equal protection violation.

## III

Appellant assigns error to the jury instructions which permitted jurors to convict appellant of an aggravated murder which was committed by one or more alternative means.[3] He contends the verdict is fatally defective because the trial court, by so instructing the jury, failed to insure that the jurors agree unanimously as to the alternative used.

First, appellant argues that two separate crimes are instructed upon by an allegation that the killing occurred in the course of rape *or* kidnapping. We disagree.

---

[3] "To convict the defendant of the crime of aggravated murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

"(1) That on or about the 28th day of September, 1976, Kelly Ann Emminger, was killed;

"(2) That the defendant was attempting to commit rape in the first degree or kidnapping in the first degree;

"(3) That the defendant caused the death of Kelly Ann Emminger in the course of or in furtherance of rape in the first degree or kidnapping in the first degree;

"(4) That Kelly Ann Emminger was not a participant in the crime;

"(5) That the acts which caused the death of the decedent occurred in King County, Washington.

"If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

"On the other hand, if, after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty." Instruction No. 5.

"A person commits the crime of aggravated murder in the first degree when he commits or attempts to commit rape in the first degree or kidnapping in the first degree, and in the course of and in furtherance of rape in the first degree, and kidnapping in the first degree, the defendant or another participant causes the death of a person other than one of the participants.

"A person attempts to commit a crime if, with intent to commit a specific crime, he does any act which is a substantial step toward the commission of that crime." Instruction No. 7.

No exception was taken to Instruction No. 7.

■ The jury instructions to which appellant assigns error reflect in part the language of RCW 9A.32.045(7). In determining whether a single crime committable by various means, or separate and distinct crimes are described by instructions, we must examine the lawmaker's intent. *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976). If intent is clear and the language of the statute unambiguous, it must be construed in conformity with its obvious meaning, and there is no room for judicial interpretation. *Roza Irrigation Dist. v. State,* 80 Wn.2d 633, 497 P.2d 166 (1972); *King County v. Seattle,* 70 Wn.2d 988, 425 P.2d 887 (1967); *cf. State v. Arndt, supra* at 378.

The statute with which we are concerned states:

A person is guilty of aggravated murder in the first degree when he commits murder in the first degree as defined in RCW 9A.32.030 under or accompanied by any of the following *circumstances*:

. . .

(7) The defendant committed the murder in the course of or in furtherance of the crime of rape *or* kidnaping or in immediate flight therefrom.

(Italics ours.) RCW 9A.32.045(7).

■ By defining specific *circumstances* which specify the crime and enhance the penalty, voters without question intended to describe but one crime—aggravated murder, which could be committed by various means. Further, this statute is analogous to premeditated first–degree murder and felony–murder. Where these crimes are charged, alternate means, not repugnant to one another, may be instructed upon since only a single offense, a killing, is committed. *State v. Talbott,* 199 Wash. 431, 91 P.2d 1020 (1939) (felony–murder and premeditated murder); *State v. Stuhr,* 1 Wn.2d 521, 96 P.2d 479 (1939) (indecent liberties); *People v. Milan,* 9 Cal. 3d 185, 507 P.2d 956, 107 Cal. Rptr. 68 (1973) (first–degree murder); *People v. Chavez,* 37 Cal. 2d 656, 234 P.2d 632 (1951) (first–degree murder); *State v. Hazelett,* 8 Ore. App. 44, 492 P.2d 501 (1972) (first–degree

murder); *see State v. Arndt, supra* at 390 (Brachtenbach, J., dissenting), and the cases cited therein.[4]

The statute involved in this case clearly describes a single offense. It is, however, one which can be committed in one or more ways, neither of which is repugnant to the other. This being so, the jury verdict was required to be unanimous as to the guilt of appellant for aggravated murder, so long as substantial evidence was presented to support each of the alternative circumstances or methods of committing it. *State v. Arndt, supra; State v. Talbott, supra.*

Appellant argues, however, that there is *no* evidence to support the alternative method of kidnapping. Thus, he asserts reversal is warranted under the above test.

Under the statutory scheme, in order to find that appellant committed aggravated murder by the kidnapping alternative, it was necessary for the jurors to find that appellant committed the crime while in the course of or in furtherance of an abduction of the victim. RCW 9A.32-.045(7), RCW 9A.32.030(1)(c)(5), and RCW 9A.40.010 and .020. As defined for purposes of the kidnapping statute, *abduct* means: "to restrain a person by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly force". RCW 9A.40.010(2). And *restrain* means restriction of "a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty. RCW 9A.40.010(1).

 Appellant suggests the evidence is insufficient to establish abduction. Review of the sufficiency of evidence is limited to a determination of whether the State has produced *substantial* evidence tending to establish circumstances from which a jury could reasonably infer the fact to be proved. *State v. Randecker,* 79 Wn.2d 512, 487 P.2d

---

[4]It should be noted, in this respect, that *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976), overrules the pertinent dicta in *State v. Golladay,* 78 Wn.2d 121, 470 P.2d 191 (1970), insofar as it is inconsistent with that opinion. The same reasoning and result applies here.

1295 (1971). In determining whether the necessary quantum of evidence exists, it is unnecessary for the court to be satisfied of guilt beyond a reasonable doubt. It is only necessary for it to be satisfied that there is substantial evidence to support the State's case or the particular element in question. *State v. Randecker, supra; State v. Luoma,* 88 Wn.2d 28, 558 P.2d 756 (1977).

 In this case, the evidence which the jury heard and was entitled to believe, would establish that the victim, fully clothed, was physically swept off her feet to be carried away from the point of initial encounter by an individual fitting the description of appellant. She evidently resisted, as best an 8 1/2–year–old child could, by kicking and screaming. Her resistance was met by an attempt to muffle her screams and then by use of a butcher knife. The victim had two wounds, one described as a defensive wound on her hand and another in her chest, the latter penetrating her heart and the aorta. After the stabbing, the victim, bleeding profusely, was removed to a secluded stairwell where appellant was observed with her then substantially nude body.

Furthermore, the outside of appellant's shirt and pants were stained with the victim's blood. In addition, it was noted at the police station that the fly of appellant's pants and his shorts were blood smeared and the shorts askew in such a fashion as to expose his genitals.

From these facts and circumstances, the jury could reasonably believe that appellant attempted to physically restrain the victim in the alleyway, and when he was met with her screams and resistance he used the butcher knife—a deadly force—as a means of accomplishing restraint. Further, the jury was instructed, in statutory language, on abduction by secreting.[5] The jurors could have

---

[5] "A person commits the crime of kidnapping in the first degree when he intentionally abducts another person with intent to facilitate commission of any felony or flight thereafter.

"'Abduct' means to restrain a person by either

also reasonably believed that appellant wanted to isolate, conceal, and hold the victim in order to commit his crime of rape, and thus killed in furtherance of so secreting the victim in the secluded alcove of the stairwell.

We are satisfied that there exists substantial evidence from which the jury could infer appellant killed while in the course of or in furtherance of the statutorily defined offense of kidnapping. Appellant does not challenge the sufficiency of the evidence regarding rape. Thus, since there is substantial evidence of both circumstances, applying *Arndt,* it was not error to instruct the jury in the alternative.

## IV

The final argument we must address is the constitutionality of RCW 9A.32.046,[6] the codification of Initiative 316, § 2, insofar as it imposes a mandatory death penalty. Appellant argues it violates the eighth and fourteenth amendments to the United States Constitution as interpreted in *Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); *Proffitt v. Florida,* 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976); *Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976); *Roberts v. Louisiana,* 431

---

"(a) *secreting or holding her in a place where she is not likely to be found,* or

"(b) using or threatening to use deadly force.

". . ." Instruction No. 9.

[6] "A person found guilty of aggravated murder in the first degree as defined in RCW 9A.32.045, shall be punished by the mandatory sentence of death. Once a person is found guilty of aggravated murder in the first degree, as defined in RCW 9A.32.045, neither the court nor the jury shall have the discretion to suspend or defer the imposition or execution of the sentence of death. Such sentence shall be automatic upon any conviction of aggravated first degree murder. The death sentence shall take place at the state penitentiary under the direction of and pursuant to arrangements made by the superintendent thereof: *Provided,* That the time of such execution shall be set by the trial judge at the time of imposing sentence and as a part thereof." RCW 9A.32.046.

U.S. 633, 52 L. Ed. 2d 637, 97 S. Ct. 1993 (1977) (per curiam).

The respondent urges us to uphold the constitutionality of this law. First, it argues the Supreme Court's failure to set forth a majority rationale in the above cases justifies our disregarding the effect of these cases in reaching our decision.

Theoretically, a case without a rationale subscribed to by a majority of the court stands only for its general result. Comment, *Supreme Court No-Clear-Majority Decisions, A Study in Stare Decisis,* 24 U. Chi. L. Rev. 99 (1956). And in the series of Supreme Court cases striking down mandatory death penalty statutes there is, as respondent notes, a lack of majority rationale. The court is clearly split on the issue of whether or not the death penalty should ever be employed in a civilized society.

The result the court has reached in each case, however, has been consistent: invalidation of mandatory death penalties. The court has recently reemphasized its disapproval of the mandatory death penalty by stating:

[I]t is *essential* that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense.

(Footnote omitted. Italics ours.) *Roberts v. Louisiana, supra* at 637.

We believe the import of this language is clear; a mandatory death penalty cannot withstand constitutional scrutiny. Thus, we decline respondent's invitation to disregard the decisions of the Supreme Court on this issue.

Respondent also points out that a voter approved mandatory death penalty case has not yet been subject to the Supreme Court's analysis. It urges us to consider that when faced with such a case, the court would uphold the penalty against constitutional challenge.

Respondent's belief that a voter initiative mandatory death penalty such as RCW 9A.32.046 might be sustained is based on one of the more troubling aspects of the death

penalty cases. The Supreme Court has invalidated legislatively enacted mandatory death penalties by resting on the Eighth Amendment. That amendment assures that a state's power to punish is exercised within the limits of civilized standards. *Woodson v. North Carolina, supra.* To determine these limits and reach the conclusion that a mandatory death penalty is in excess of the limits, the court looked to history, juror attitudes, and legislative enactments. It then reached the decision to invalidate the mandatory death penalty by finding evidence of a *societal belief* that it was an unduly harsh punishment. *Woodson v. North Carolina, supra.*

But, respondent argues that the court would necessarily have to reach an opposite result where *voters* initiate the penalty and give evidence of societal approval. While this argument points out the pitfall inherent in resting a constitutional holding on social beliefs, we cannot conceive the court would uphold RCW 9A.32.046. It has considered the possibility that reenactment of the mandatory death penalty evinces a trend toward societal approval of that penalty. The court has concluded, and we believe rightfully, that the drafting of mandatory death penalty statutes was the result of a misreading of the court's multi-opinioned decision in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972).[7] *Woodson v. North Carolina, supra* at 298–99. Further, the court has not yet adopted the view urged by respondent, that public perceptions alone are conclusive on the issue of the propriety of criminal sanctions. A penalty must also accord with human dignity, which is the basic concept underlying the Eighth Amendment. *Gregg v. Georgia, supra* at 173.

The holdings of the Supreme Court lead us to an inescapable conclusion. Specifically, RCW 9A.32.046, which is

---

[7]Indeed, among the arguments advanced by proponents of Washington's mandatory death penalty was that the United States Supreme Court had ruled capital punishment *must* be mandatory. Official Voters Pamphlet 6 (1975). This was clearly a misreading of *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972).

the mandatory death penalty section of RCW 9A.32, is invalid as it violates the eighth and fourteenth amendments to the United States Constitution.

We affirm the judgment that appellant is guilty of aggravated murder in the first degree. Our conclusory holding, however, defeats the sentence of death imposed on appellant by the trial court pursuant to RCW 9A.32.046. Accordingly, we remand the cause for reimposition of the appropriate sentence.

WRIGHT, C.J., and ROSELLINI, BRACHTENBACH, and HOROWITZ, JJ., concur.

STAFFORD, J. (dissenting in part)—I concur with the majority's disposition of the *Miranda,* equal protection, and death penalty issues. I dissent from the majority's analysis of kidnapping under RCW 9A.32.045, the aggravated murder statute.

For there to be a proper instruction on aggravated murder in the first degree which, under the circumstances at issue here, requires first-degree murder to be committed in the course of or furtherance of kidnapping, there must be substantial evidence of that aggravating circumstance. I agree with the dissent that there is not substantial evidence of kidnapping. However, I would not interpret the requirements of RCW 9A.32.045(7) as broadly.

A person commits kidnapping when he intentionally abducts another in one of two ways: (1) restraining the victim by secreting or holding him in a place where he is not likely to be found; or (2) restraining the victim by using or threatening to use deadly force. For the reasons discussed in the dissent, I would hold the deadly force contemplated by RCW 9A.40.010(2)(b) is absent in the instant case.

Further, I agree with the dissent that the majority's construction of RCW 9A.40.010(1) will lead to absurd results if nonsubstantial restraint of a victim is characterized as kidnapping. Moreover, the majority's analysis fails to recognize the spirit and intent of the legislature's effort in enacting

the kidnapping statute and particularly its inclusion of kidnapping as one of the attendant circumstances that elevates murder in the first degree to aggravated murder. The creation of the crime of aggravated murder and the severity of the punishment attached thereto indicate that only *substantial* movement or isolation *independent of the murder itself* is contemplated by the statute. Under the bare facts of this case, in the absence of the murder committed, it is highly improbable a prosecutor would have been permitted to go to the jury on a kidnapping charge.

I agree with the dissent that the mere *incidental* restraint and movement of a victim which might occur during the course of a murder are not indicia of genuine kidnapping. At best they are a part of the murder itself. In characterizing the movement and restraint here as incidental, I do not mean to suggest, as the dissent seems to indicate, that under every conceivable set of facts a movement of 20 feet or secreting in a stairwell would be incidental. That which constitutes incidental movement is not solely a matter of measuring feet and inches. Rather it is a determination made under the facts of each case, in light of the totality of surrounding circumstances. This characterization is as much a consideration of *the relation between the restraint and the murder* as a measure of the precise distance moved or place held. Thus, it involves evaluation of the nature of the restraint in which distance is but one factor to be considered.

In the instant case there is no substantial evidence of restraint of the victim by secreting or holding her in a place where she was unlikely to be found.

HICKS, J., concurs with STAFFORD, J.

UTTER, J. (dissenting)—I concur in the majority's treatment of the *Miranda* issue, the equal protection challenge, and the death penalty argument. I agree with the majority that there is sufficient evidence of an attempt to rape the

victim. However, I must dissent from the majority's treatment of the jury instructions which included the kidnapping issue among the matters to be considered by the jury.

The defendant has been found guilty of quite possibly the most repulsive crime of all—the killing, in the course of sexual abuse, of a young child. A reluctance to overturn such a conviction is understandable and one I share. Nevertheless, I believe this conviction must be reversed and the case retried because serious errors in jury instructions exist which, if not corrected now, will haunt us until the law is corrected.

The majority's analysis on the kidnapping issue is less than crystal clear. For this reason it is difficult to confidently declare its precise effect. Nevertheless, assuming that the majority's analysis of kidnapping will have vitality beyond this case, it will have at least one of two alternative consequences which *must* follow from this decision. It is arguable that both must flow from it. The majority opinion seems to make kidnapping a comprehensive crime applicable to nearly all crimes against the person, overlapping and rendering superfluous all statutes on robbery, rape and assault. The opinion seems to define the term, "abduct", directly contrary to the indications of the drafters' intent and contrary to the New York statute after which our law is patterned.

Second, by its language the majority seems also to make every intentional killing occurring in this state an aggravated murder in the first degree, *which must be charged and tried as such.* I emphasize that at least one of these results must occur as a consequence of the majority opinion; it is possible to explain away one or the other, but the conviction must rest on one or the other ground.

Under our statutory scheme, a kidnapping occurs when, and only when, the defendant "intentionally abducts" the victim. RCW 9A.40.020–.030. "Abduct" is defined in the statute as "to restrain a person by either (a) secreting or holding him in a place where he is not likely to be found, or

(b) using or threatening to use deadly force". RCW 9A.40-.010(2). Thus, there can be no kidnapping unless the victim is held in a place where not likely to be found, or the victim is subjected to the use or threat of deadly force.

There are three possible bases upon which the majority may be relying to support its finding of sufficient evidence of a kidnapping here. The requisite "abduction" must be predicated upon (1) restraint through a "secreting" of the victim in a place where unlikely to be found, (2) restraint through application of deadly force, *other than* the fatal stabbing, or (3) restraint supplied by the *killing itself.* Because (1) and (2) require similar analysis, they are considered together in the next portion of this dissent, while consideration of basis (3) is postponed to a later section.

## I

The evidence is entirely contrary to any allegation of secreting or holding the victim in a place where she was unlikely to be found. In apparent recognition of this fact, the prosecutor himself disclaimed any reliance upon this provision of the law in closing argument. Further, the prosecutor characterized the distance which the victim was moved as perhaps only 20 feet from the point of initial attack. The location to which the victim was removed was outside and quite public, despite the majority's description of it as a "secluded stairwell". Although perhaps less public than the point at which the defendant first accosted the victim, the stairwell cannot possibly be characterized as a place where the victim was truly "unlikely to be found". The stairway led to a door from which help would have been obtainable by the victim; the stairway was a common area used routinely by the residents of and visitors to the multi–dwelling building it served. The area was entirely visible from a nearby house and from numerous other vantage points. Conviction based on kidnapping cannot be rested upon this portion of the definition if we are to accord any meaning at all to the requirement that the victim be held where unlikely to be discovered. It seems to me that

this definition is so clearly intended to apply only to situations of actual isolation from open public areas that its application to the facts of this case is absurd.

Further, the only evidence of the threat or use of deadly force to restrain the victim is the actual wounds inflicted at the time of the fatal stabbing. In fact, the evidence and even the majority's characterization of the facts clearly show no use or threat of deadly force until the time of killing. No witness testified to any form of restraint other than by lifting the victim off the ground and carrying her or by holding onto her arms and pushing or pulling her. As the majority phrases it, the victim "resisted, as best an 8 1/2–year–old child could, by kicking and screaming." Obviously, her "best" was inadequate to resist being carried off by an adult male; the defendant was capable of restraining the victim *without* use of deadly force, and all the evidence indicates that he did *in fact* so restrain her. Until the moment of the infliction of the fatal wound, under the evidence produced and reasonable inferences therefrom, there was no satisfactory showing of the use or threat of deadly force.

Reliance upon the "secreting" rationale or characterization of the force applied to the victim, other than the fatal stabbing itself, as deadly force to supply the element of abduction necessary under the statute strains the interpretation of these kidnapping requisites beyond that which is reasonable, or even tolerable. In addition, it makes every crime against the person—robbery, rape, assault—a kidnapping as well, because under this interpretation each of these crimes inherently involves an abduction "to facilitate commission of a felony . . ."—with the necessary felony being the robbery, rape, or assault itself.

If the victim here were to be considered secreted or held in a place where she was not likely to be found, under RCW 9A.40.010(2)(a), then every one of the above–mentioned crimes would be a kidnapping except when committed at a busy intersection or inside a crowded building open to the public. The kidnapping statute would encompass virtually

all such crimes, as persons committing them seldom select such high–density locations for their acts. Similarly, if the majority were to claim that evidence of deadly force, other than the fatal stabbing itself, was produced sufficiently here to meet the requirements of 9A.40.010(2)(b), then any level of force or threat thereof must be termed deadly force, and *any* robbery, rape, or assault contains an element of deadly force as defined for kidnapping purposes. This necessarily follows from the fact that the evidence shows no use or threat of use of any weapon prior to the fatal stabbing; only what I would term nonlethal physical force, muscular strength, preceded the stabbing under the evidence adduced at trial. If superior muscular force is to be regarded as "deadly force", the prosecutor could convert a class C felony or even a gross misdemeanor into a class A, or at least a class B, felony. Through this bootstrapping, a third–degree assault—for example, forceably resisting arrest when stopped for a traffic violation, a class C felony—also gives rise to a potential conviction for kidnapping in the first degree because that kidnapping would have occurred to facilitate commission of a felony, the third–degree assault itself. While the prosecutor would be unlikely to press the kidnapping charge, with its potential sentence of not less than 20 years, the mere fact that it could be charged as such would give the prosecutor intolerable leverage in plea bargaining, even in a case where the likelihood of conviction on the assault charge is minimal. Further, such an extraordinary possible charge for a relatively minor offense would surely invite occasional abuse when a defendant particularly distasteful to the prosecutor and/or police was subject to the charge.

The concerns expressed herein are not fanciful nor unique to this opinion. A number of courts have been similarly disturbed with the potential for abuse, and have therefore refused to find a kidnapping inherent in every crime against the person. One of the most direct expositions of this problem is found in *People v. Adams,* 34 Mich.

App. 546, 560, 192 N.W.2d 19 (1971), *modified,* 389 Mich. 222, 205 N.W.2d 415 (1973):

Discretion thus unbound by fixed standards becomes not discretion in the legal sense of the term, but, rather, naked and arbitrary power.

It is obvious that virtually any assault, any battery, any rape, or any robbery involves some "intentional confinement" of the person of the victim. To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery, into a capital offense. A literal reading of the kidnapping statute would permit a prosecutor to aggravate the charges against any assailant, robber, or rapist by charging the literal violation of the kidnapping statute which must inevitably accompany each of those offenses.

In this connection, it is important to remember that under present precedent and practice a prosecutor is governed solely by his personal judgments; there are no objectifiable standards which must be applied. Plea bargaining is an established practice; a prosecutor may, therefore, threaten conviction of a capital offense with a view to extracting a guilty plea without any review of his charging decision.

(Footnotes omitted.) *See also, e.g., People v. Miles,* 23 N.Y.2d 527, 245 N.E.2d 688, 297 N.Y.S.2d 913, *cert. denied,* 395 U.S. 948, 23 L. Ed. 2d 467, 89 S. Ct. 2028 (1969); *People v. Adams,* 389 Mich. 222, 205 N.W.2d 415 (1973); *State v. Dix,* 282 N.C. 490, 193 S.E.2d 897 (1973).[8]

---

[8]The New York experience with kidnapping is discussed later in the text. In North Carolina, a subsequent statutory enactment reversed much of the *Dix* decision with respect to the nature and quality of the asportation required to sustain a kidnapping conviction. However, the most important core of the *Dix* case was preserved through the Supreme Court's interpretation of the new legislation to require, for kidnapping, a "restraint separate and apart from that which is inherent in the commission of the other felony." *State v. Fulcher,* 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978).

Other courts have expressed concern over prosecutorial abuse yet have left the possibility for such abuse intact. In *People v. Knowles,* 35 Cal. 2d 175, 217 P.2d 1 (1950), the California Supreme Court, in the words of one commentator, "made it clear that it felt that the district attorney had abused the trust of his office by prosecuting the defendant on kidnapping charges." Parker, *Aspects of Merger in the Law of Kidnapping,* 55 Cornell L. Rev. 527, 539 (1970). Nevertheless, the conviction for kidnapping was upheld. In *State v. Johnson,* 67 N.J. Super. 414,

I fear that the majority in this case takes our kidnapping law into a quagmire that the experience of other states teaches us cannot be exited gracefully. I would prefer to profit from the experiences of other jurisdictions instead of gaining wisdom through the more brutal process of repeating their errors.

The California history with stretching the definition of kidnapping to affirm convictions is particularly instructive as an example of the magnitude of the problem which the majority here willingly assumes. Although the problems began before 1950, the case of *People v. Knowles,* 35 Cal. 2d 175, 217 P.2d 1 (1950), commenced the real difficulties from which California is still recovering. The statute in effect at that time proscribed kidnapping in similar terms to that relied upon by the majority here. Kidnapping occurred when anyone "'*seizes, confines, . . .* abducts, conceals, . . . *with intent to hold or detain, or who holds and detains,* [an] individual for ransom, reward or to commit extortion or robbery. . . .'" *Knowles,* at 180. The court in *Knowles* was presented with a conviction for kidnapping upon facts indicating only a simple robbery involving minor incidental movement of the store attendants. Nevertheless, the defendant was sentenced to life imprisonment without possibility of parole for his "kidnapping."

Knowles never served his sentence on this kidnapping conviction. *See* Parker, *Aspects of Merger in the Law of*

---

170 A.2d 830 (1961), the Appellate Division of the New Jersey Superior Court declared it was the prosecutor's "moral obligation" to refrain from prosecuting for kidnapping when the facts did not truly warrant such prosecution. That "obligation", however, was not to be enforced by the courts. Such an approach seems irrational; if a prosecution for kidnapping is, under judicial construction of the kidnapping law, legally proper but nevertheless a gross abuse of prosecutorial discretion, it is extremely strong evidence that the court's construction and application of the kidnapping offense is erroneous. It is not the least bit surprising, then, that *Knowles* has been totally overruled and abandoned, *see People v. Daniels,* 71 Cal. 2d 1119, 459 P.2d 225, 80 Cal. Rptr. 897 (1969), and that *Johnson* has been modified to place a duty of scrutiny on the courts to assure that a kidnapping separate from other crimes has been committed, *see State v. Hampton,* 61 N.J. 250, 294 A.2d 23 (1972).

*Kidnapping,* 55 Cornell L. Rev. 527, 539 (1970). Commentators regarded the result as ridiculous and absurd, and castigated the court for failing to be realistic in its statutory interpretations. The major criticism revolved around the court's willingness to find a kidnapping inherent in every robbery. *See, e.g.,* Comment, *Judicial Construction of Kidnapping Statutes,* 15 Albany L. Rev. 65 (1951); Comment, *Robbery Becomes Kidnaping,* 3 Stan. L. Rev. 156 (1950); Note, *Criminal Law: Kidnapping for the Purpose of Robbery,* 38 Cal. L. Rev. 920 (1950); Note, *Criminal Law–Kidnapping—California Penal Code Section 209,* 24 S. Cal. L. Rev. 310 (1951). The state legislature regarded the result in *Knowles* as so outrageous that the law was immediately amended to require asportation before kidnapping in the course of a robbery could be found. Cal. Pen. Code § 209 (West 1955).

Subsequent decisions of the California Supreme Court all but destroyed and ignored the asportation requirements inserted in the 1951 amendment requiring a "carrying away" to support the charge of kidnapping during a robbery. The court essentially returned to the *Knowles* result and affirmed a conviction for kidnapping in *People v. Chessman,* 38 Cal. 2d 166, 238 P.2d 1001 (1951), in which the defendant moved one of his robbery victims 22 feet, and the death penalty was imposed and carried out.[9] The court, in language that haunted it for 18 years thereafter, declared: "It is the fact, not the distance, of forcible removal which constitutes kidnaping . . ." *People v. Chessman, supra* at 192. This language was relied upon in the most incredible case of all, *People v. Wein,* 50 Cal. 2d 383, 326 P.2d 457 (1958), to uphold the defendant's death sentence for kidnapping. The defendant in that case had

---

[9]After *People v. Chessman,* 38 Cal. 2d 166, 238 P.2d 1001 (1951), it was evident that all the California legislation passed in response to *Knowles* had accomplished was the removal of absolute "standstill" robberies from the reach of the "kidnapping in the course of robbery" statute. The slightest movement of any victim—which automatically occurs as an inherent part of virtually every robbery—still allowed a prosecution based on kidnapping.

broken into homes and robbed and raped the victims, forcing incidental movement entirely and solely within the victims' own houses. In one case, the "movement" supporting the kidnap conviction was the forcing of the victim, from a standing position next to the bed, onto the bed itself. *See People v. Wein, supra* at 412 (Carter, J., dissenting). Quite rightly, Professor Packer termed *People v. Wein, supra,* the *"reductio ad absurdum* case". *See* Packer, *The Case for Revision of the Penal Code,* 13 Stan. L. Rev. 252, 259 n.41 (1961).

California struggled with the albatross represented by this unfortunate legacy until 1969 when the Supreme Court finally held that merely incidental movement of a robbery victim could not be kidnapping. In *People v. Daniels,* 71 Cal. 2d 1119, 459 P.2d 225, 80 Cal. Rptr. 897 (1969), the court reviewed three robbery–rapes in which the victims had been moved as little as 5 feet and as much as 30 feet within their own homes, and observed at pages 1126–27:

> Under the rule of *Chessman* and *Wein,* such brief movements of the victims would constitute "kidnaping or carrying away" within the meaning of the statute and would therefore be sufficient to support defendants' convictions of violating section 209.
>
> We believe, however, the time has come to reconsider the construction placed upon the statute in *Chessman* and applied in *Wein.* More than a decade has elapsed since the latter decision, and almost two decades since the former. During this period the law of kidnaping has not remained stagnant. There have been, as we will demonstrate, fresh judicial approaches, far–reaching legislative innovations, and considerable analysis of the problem by legal commentators and scholars. Out of this ferment has arisen a current of common sense in the construction and application of statutes defining the crime of kidnaping. *Chessman* and *Wein,* it now appears, stand as obstructions to the flow of that current in California.

In overruling *Chessman* and *Wein,* the court invoked a doctrine of judicial construction which I believe should be applied in the instant case as well:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." (*United States v. Kirby* (1868) 74 U.S. (7 Wall.) 482, 486–487 [19 L.Ed. 278, 279]; accord, *People v. Oliver* (1961) 55 Cal.2d 761, 767 [12 Cal.Rptr. 865, 361 P.2d 593], and cases cited.)

*People v. Daniels, supra* at 1130. Although the *Daniels* decision has not ended all problems of interpreting kidnapping statutes in California, *see* Note, *Struggling with California's Kidnaping to Commit Robbery Provision,* 27 Hastings L.J. 1335 (1976), it has been a major force in rationalizing it.

Neither California's history nor its ultimate discarding of the majority's kidnapping analysis is unusual. In *People v. Adams, supra,* the Michigan Court of Appeals quoted the canon of statutory construction as set out above in *Daniels.* In applying that canon to a case of assault, the court summarized at page 568:

We have concluded that under the kidnapping statute a movement of the victim does not constitute an asportation unless it has significance independent of the assault. And, unless the victim is removed from the environment where he is found, the consequences of the movement itself to the victim are not independently significant from the assault—the movement does not manifest the commission of a separate crime—and punishment for injury to the victim must be founded upon crimes other than kidnapping.

New York went through a law–wrenching experience similar to California's prior to 1965. *See* Parker, *Aspects of Merger in the Law of Kidnapping,* 55 Cornell L. Rev. 527 (1970), and the description of New York's experience in *People v. Daniels, supra.* In *People v. Levy,* 15 N.Y.2d 159, 164–65, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965), the New York Court of Appeals overruled earlier, *Chessman–* and *Wein–*like cases and held that the kidnapping statute was

applicable only to "'kidnapping' in the conventional sense
. . ."

The New York experience is particularly compelling currently because that state's statute defining kidnapping utilizes nearly identical language to that employed in RCW 9A.40.010(2) and RCW 9A.40.030(1): "A person is guilty of kidnapping in the second degree when he abducts another person." New York Pen. Code § 135.20 (McKinney 1975). "Abduct" is defined in the code, section 135.00, as "to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." Since the 1967 revision incorporated these provisions into New York law, the New York Court of Appeals has reaffirmed its prior finding of merger of kidnapping into other offenses when the technical "kidnapping" is incidental to the commission of another crime. A conviction for kidnapping will not be sustained in New York when the circumstances indicate that the activity constituting "kidnapping" was merely incidental to the commission of another crime. In *People v. Cassidy*, 40 N.Y.2d 763, 358 N.E.2d 870, 390 N.Y.S.2d 45 (1976), the court held that the kidnapping statute was not applicable where the defendant grabbed the victim and dragged her 70 feet, at knifepoint, attempted to rape her inside a garage, and then fled. The similarity to the instant case is striking; the differences factually suggest that the *Cassidy* case would more strongly support a kidnapping than do the facts in this case because deadly force was evident in the movement of the victim, unlike in this case, and the eventual location of the sexual assault was far less public in *Cassidy* than it was here. The court in *Cassidy* observed, at pages 765–68:

> The merger doctrine was of judicial origin and was based on an aversion to prosecuting a defendant on a kidnapping charge in order to expose him to the heavier penalty thereby made available, where the period of abduction was brief, the criminal enterprise in its

entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine "kidnapping" flavor . . .

. . .

The merger doctrine is intended to preclude conviction for kidnapping based on acts which are so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them. "It is this kind of factual merger with the ultimate crime of the preliminary, preparatory, or concurrent action that the rule is designed to recognize, and thus prevent unnatural elevation of the 'true' crime to be charged. It is a merger suggestive of, but not quite like, the merger of the preparation and attempt with the consummated crime, a familiar concept in the criminal law."

. . .

. . . We agree with the Appellate Division that there was here no independent abduction; the detention of the victim was incidental to the commission of the crimes of assault and attempted sexual abuse. There was no asportation which could be the predicate for conviction of a separately cognizable offense; we cannot accept the contention that, because the assault did not take place on the street in full public view at the spot where the attack was initiated but rather occurred under cover in a garage about 70 feet away, it should be permissible to prosecute defendant for kidnapping as well.

(Citations omitted.)

New York's experience, the logic of its current approach, and the similarity of its statute to ours combine to present an imposing reason for us to follow its lead. However, there is an additional compelling reason for adopting New York's approach: our statute is not only similar to, but *patterned after* New York's. Persons involved with the drafting of our statute identify our statute's genesis in New York law in the Revised Criminal Code Training and Seminar Manual by the Washington State Criminal Justice Training Commission, at 9A.40.010 (1976). Further, the comment accompanying New York's statute, section 135.00, is quoted verbatim in expressing our drafters' intent:

> The term "abduct" is defined in such fashion as to make abduction a *very serious form of restraint,* savoring strongly of the *substantial removal, isolation* and/or violence usually associated with *genuine* kidnapping.

(Italics mine.) Washington State Criminal Justice Training Commission, Revised Criminal Code Training and Seminar Manual at 9A.40.010 (1976). This evidence of intent strongly suggests the inapplicability of the kidnapping statute in the absence of a "genuine" kidnapping. Except for the fatal stabbing itself, a matter to be taken up later, there was no substantial removal, isolation, and/or violence of a kind indicating a genuine kidnapping. Further, it can confidently be stated that the drafters did not intend that the kidnapping statute be applicable to all robberies and assaults[10] because it is doubtful that they would intentionally render their work on those crimes superfluous. If kidnapping, punishable in all instances as severely as the underlying crime, can always be applied whenever any other crime occurs, the drafters wasted considerable time preparing statutes on these other offenses in the new criminal code. I would follow the unassailable analysis that New York has developed, particularly because New York's current approach is the product of experience gained in repairing the damage sustained in the legal minefield we now enter. Defendant's minor movement and restraint of the victim in this case was incidental to his sexual assault. Neither the prosecution nor the majority would suggest that there is any evidence that the defendant had any intention of restraining the victim for any other purpose.

I would hold that a kidnapping is chargeable under our statute only where there is an abduction which is separate from, and independent of, another crime. Restraint and incidental movement of a victim during a robbery, rape, or

---

[10]Revision of the rape law was accomplished separately; it was not a part of the new criminal code prepared and adopted as Title 9A. *See* RCW 9.79. It was, however, enacted by the same legislature during the same session as the new criminal code, suggesting that the same analysis can reasonably be applied to rape that is applied to robbery and assault, two offenses covered in the new code, Title 9A.

assault are not indicia of a genuine kidnapping; they are, instead, generally a necessary and integral part of the robbery, rape, or assault itself. Restraint and movement which do not exceed that reasonably necessary to complete one of those crimes should, I believe, be construed to be inherent in the crime, resulting in a merger which extinguishes any separate kidnapping offense.[11]

---

[11]Under this merger approach, there are difficult judgments in determining whether restraints and movements are truly incidental to and inherent in other crimes. Here, however, we are not presented with such difficult issues; the facts of this case present movement so clearly incidental to an attempted rape that we need not grapple with a precise definition of conduct incidental to other crimes.

Some expositions of the merger doctrine refer to merger of kidnapping with *lesser* crimes. Indeed, dictum in some cases suggests that merger analysis may not be applicable when the underlying crime is perceived to be more serious than kidnapping. For the most part, the question of merger with a more serious crime is moot, because conviction for kidnapping will not generally be sought where the underlying crime carries greater penalties. Further, even if a kidnapping conviction is returned in addition to one for the more serious crime, kidnapping is unlikely to be the focus of any appeal; the greater sentence for the more serious crime eliminates, in practical terms, any prejudice which may flow from the kidnapping conviction.

In addition, making the merger doctrine depend upon a circumstance such as whether a victim dies or whether the penalty for rape is more or less severe than that for kidnapping is analytically indefensible; such a result can be explained only in terms of an emotional desire to pyramid convictions upon one committing a particularly horrible murder, without regard to whether the defendant actually committed any additional crime. If a given set of acts are so clearly a part of another crime that a separate kidnapping charge is simply not warranted, it should be of little consequence for kidnapping charges that the victim died. The death properly allows an assault, robbery, or rape to become a *murder,* because such enhancement is intended and statutorily consistent. However, the statutory definition of *kidnapping* is unrelated to the victim's survival or death; consistency requires that the interpretation given that definition not vary based on considerations unrelated to the kidnapping offense itself.

Even application of the lesser–greater distinction in applying the merger doctrine would require that we find a merger here. The underlying philosophy of that distinction is that it is unfair and unreasonable to allow a crime to be bootstrapped into one more serious. In the ordinary homicide case, application of this philosophy would not prohibit a conviction for kidnapping in addition to one for murder, because the murder conviction is the more serious, and it is unaffected by the kidnapping charge and conviction. However, here the kidnapping was used to bootstrap the murder itself into an ever more serious crime, aggravated murder. This is precisely the result that the merger doctrine, even when limited by the lesser–greater distinction, was designed to prevent.

## II

The foregoing analysis applies to only two of the three possible bases for finding a kidnapping here: (1) secreting of the victim where unlikely to be found, and (2) deadly force other than the fatal stabbing. Remaining for analysis is the third possible basis, the killing itself as supplying the "restraint" necessary for an abduction. This may well be the actual foundation for the majority's kidnapping decision because this approach does not completely disregard the requirements of the statutory definition of kidnapping as would either of the others, and because the majority seems to suggest reliance upon this rationale.

Finding the killing itself to supply the restraint necessary for an abduction does, however, raise serious, even disastrous, consequences of its own. Aside from all the same merger problems previously discussed, reliance upon the killing itself as a "restraint" for kidnapping purposes seriously distorts the homicide law of this state. While infliction of a fatal wound might be properly regarded as the ultimate form of "restraint", in a general sense, through the use of deadly force, I cannot believe that, as used in the *kidnapping* statute, the term was designed to scramble the law of *homicide* the way that it must under this analysis.

Under this theory, *every* intentional killing is also a kidnapping because the killing itself supplies the requisite restraint and, hence, abduction under RCW 9A.40.010–.030. Automatically, this intentional killing becomes murder in the first degree under RCW 9A.32.030(c)(5) which provides that one causing the death of another in the course of any kidnapping is automatically "guilty of murder in the first degree."

This intentional killing, thus converted into first–degree murder, also necessarily and inevitably becomes aggravated murder under RCW 9A.32.045(7) because it was committed in the course of a kidnapping. Thus, from this time forward every intentional killing, no matter what the circumstances, is by definition aggravated murder in the first degree. Further, it *must be charged and tried as such*. As the majority

itself declares here, "where the facts and circumstances support murder in the course of first– or second–degree rape or kidnapping, the prosecutor, by virtue of the distinct effect of the voter initiative, *is left with no discretion but to charge aggravated murder.*" (Italics mine.)

I cannot believe that this result is desirable, nor can I believe that the voters, in passing Initiative 316 to punish "aggravated murder", intended to convert every intentional killing into a crime punishable by death, which sentence *must* be carried out with every conviction.[12] The very term, "aggravated murder", suggests another category of intentional killing, murder without aggravating circumstances. Our society has long found degrees of culpability even within the most serious crime of all, homicide. This societal perception has found expression in the range of penalties available for different classes of homicide in RCW 9A.32. My understanding of Initiative 316 is that it was intended to enhance the "degrees of culpability" analysis and, in the majority's own terms, "to identify those crimes which are particularly outrageous to society and to elevate the status of such crimes." In other words, the voters were adding another level to the hierarchy rather than, as the majority's analysis mandates, eliminating all distinctions among intentional killings. The initiative painstakingly, specifically, and laboriously sets out seven specific circumstances in which an ordinary first–degree murder is to be elevated into a crime punishable by death. There is not a hint in this elaborate scheme that its purpose was as simple as declaring all intentional killings to be aggravated murders in the first degree, punishable in all instances by death. If this result is truly what was intended, the drafters of the initiative and the voters selected a remarkably convoluted, obtusely indirect, and grossly overwritten method of accomplishing it.

---

[12]I recognize that the majority and I agree that the death penalty provisions of the initiative are unconstitutional. In evaluating the voters' intent in passing it, however, we must remember that the initiative as passed provided for an automatic and irreversible sentence of death following conviction.

The consequences of this result are not fully predictable. Prosecutors, now faced with the requirement of charging aggravated murder whenever they are to prosecute any intentional killing, may well find juries reluctant to convict in situations which, before now, would be chargeable as second–degree murder. This reluctance is likely to stem from the juries' knowledge that conviction means the defendant must receive a nonmodifiable sentence of life imprisonment without possibility of parole.[13] Further, prosecutors and judges are likely to feel uncomfortable about such sentences in situations involving crimes clearly not intended to be covered by the mandatory, harsh penalties of Initiative 316.

I conclude that we are sacrificing too much in rationality and fairness merely to avoid retrying this defendant, and that we must reverse his conviction and order a new trial. My conclusion applies irrespective of the basis upon which the majority relies in upholding the conviction; although the precise consequences vary depending upon the basis used, the consequences of reliance upon any of the various bases are substantially equivalent in severity and undesirability. I dissent from the majority's approval of the instructions allowing the jury to found a conviction upon a kidnapping.

### III

There is one other aspect of the majority opinion from which I must dissent. I believe the majority's approval of the jury instructions allowing conviction for aggravated murder without unanimous agreement as to the mode of commission—in this case, rape or kidnapping—violates a defendant's right to conviction beyond a reasonable doubt by a unanimous jury.

---

[13]The legislature has already modified the aggravated murder statute, particularly the provisions of the death penalty imposition making a death sentence automatic under all circumstances. Without commenting upon its constitutionality prematurely, I do note that it has returned the possibility of death for those convicted of aggravated murder through the bootstrapping technique of finding the murder itself inherently to be a kidnapping.

This case is not controlled by *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976). In *Arndt,* the crime involved—grand larceny through welfare fraud—contained alternative ways of committing it which were overlapping and often even indistinguishable. In this case, however, the "alternative" ways of committing the offense of aggravated murder are themselves separate and distinct acts. Additionally, the "methods" of committing aggravated murder at issue here—rape or kidnapping—are themselves separate and discreet *criminal* acts. Proof must establish one or the other (or both). Here, it is entirely possible that there could be no conviction for either underlying crime, although one or the other must, under the statute, be attempted or accomplished. Perhaps six jurors were resting their belief of guilt upon a kidnapping and six depended upon a rape. I believe that where, as here, the commission of specific underlying criminal acts is necessary to sustain conviction for a specified offense, jury unanimity upon a particular mode is required.

Under the majority analysis, it would be entirely proper for the legislature to define a comprehensive crime, committable in numerous unrelated ways which encompass the whole of our current definitions of individual crimes. Successful prosecution for this "master" crime would entail merely convincing each juror that the defendant engaged in some form of criminal conduct, although not even two jurors would have to agree on guilt of any one particular act which we now recognize as a separate crime. I disagree with any analysis which makes such a result possible.

DOLLIVER, J., concurs with UTTER, J.

Reconsideration granted April 24, 1979.